# Commonwealth *v.* Marshall, Appellant.

*Criminal law—Murder—Murder of the second degree—Verdict.*

1. A person may be convicted of murder of the second degree, where the jury believes evidence to the effect that the prisoner took the deceased by the throat, wickedly intending to do her great bodily harm, although not intending to kill her.

*Criminal law—Murder—Corpus delicti—Jurisdiction—Confession—Evidence—Place of the crime.*

2. In a murder trial when the circumstances of the finding of the body of the deceased and its mutilated condition are consistent with and indicate a homicide, though explainable on other theories, a confession of the defendant is admissible to connect him with the crime and to show where it was committed; and the confession is all the more admissible where there is independent evidence that the crime was committed in the place referred to in the confession.

3. It seems that proof of the place where a crime was committed is not an essential part of the corpus delicti.

*Criminal law—Murder—Evidence—Declarations of deceased—Intention—Place of homicide—Res gestæ—Harmless error.*

4. In a murder trial, where the place of the killing is shown by independent evidence, declarations of the deceased to a third person on the day of the murder that she was going that evening to meet the prisoner at such place are admissible.

5. Evidence of what a person's intentions are, is relevant circumstantially to show that he afterwards carried out his designs; and his intentions may in such case be shown by his declarations.

6. The true basis for the admission of such declarations is not on the ground that they were a part of the res gestæ, but on the ground of necessity because of the impossibility of proving intention apart from personal declarations. Com. v. Palma, 268 Pa. 434, distinguished.

7. Where the prisoner repeatedly admitted that deceased came to his office where, the evidence shows, she met her death, admission of declarations of deceased that she intended to go there, do the prisoner no harm, even if their admission was technically improper.

*Criminal law—Murder—Evidence—Drug—Effect of drug—Experts—Opinion of medical expert—Hypothetical question.*

8. In a murder trial the court properly refused to admit medical expert testimony of the effect of a drug, alleged to have been taken by the deceased, where there is no evidence that the deceased actually took such drug.

9. Nor, in such case, can the trial judge be charged with error in refusing to admit evidence of a medical expert called by the defense to explain the special significance in the medical profession of the phrase "History of the case" used by the medical expert of the Commonwealth, where the latter stated that he had not employed the phrase in its technical sense, and described exactly how he was using it.

10. Where a matter is sufficiently within common knowledge, expert opinion in reference to it is unnecessary.

11. Where autopsy reports made by doctors at the instance of the Commonwealth are mere form reports not attempting to give more than the briefest outlines of major conditions found on examination of the body of the deceased, opinion of defendant's experts based on such reports are inadmissible in an effort to attack the conclusion of the Commonwealth's physician as to the causes of the death.

12. Opinion testimony may be given only on a set of definitely established or assumed facts; all balancing of testimony or deduction of facts therefrom must be made by the jury.

13. While it is permissible for an expert to express an opinion based on nonconflicting testimony of others, where such testimony is assumed to be true, this should be allowed only where the prior testimony embodies a set of facts of such completeness as to be capable of being put in the form of a valid hypothetical question.

14. It is not reversible error to deny an expert for the defense permission to say, from the consideration of data passed upon by only one doctor for the Commonwealth, that he, defendant's expert, could not state an opinion as to the cause of death.

15. It is only by considering all of the data shown to have been considered by the experts of the Commonwealth that defendant's expert can express a proper opinion as to whether or not the cause of death could be derived therefrom.

16. An extract from a charge in a murder trial cannot be successfully assigned as error, where such extract is not properly susceptible of the construction put upon it by the prisoner's counsel.

*Criminal law—Murder—Second degree—Burden of proof—Evidence—Excuse.*

17. Where it is proved in a trial on an indictment for murder that defendant committed the deed, the burden of reducing the

crime to one of less degree rests on defendant, or, if he contends for acquittal, he must prove an excuse.

*Criminal law—Practice—Murder—Exhumation of the body—Petition—Reasons—Notice to relatives—Appeals—Record.*

18. A petition for the exhumation of a body in a murder trial, is defective if it fails to disclose what it was proposed to develop through an autopsy, more than already had been shown by the examination of the body made by the coroner's physician.

19. Such a petition is also fatally defective, if it fails to show that any notice was given to the near relatives of the deceased of the application to exhume the body.

20. The appellate court may refuse to consider the ruling of the court below on a petition and answer where copies of them do not appear in the record.

*Appeals—Review—Evidence—General objection—Admission of evidence.*

21. Where only a general objection is entered to the admission of evidence, the acceptance of the evidence will not be adjudged erroneous, on appeal, if it was competent for any purpose.

*Appeals—Review—Harmless error — Criminal law — Motive—Statement by district attorney.*

22. A slight error of statement by the district attorney in a murder trial will not be allowed controlling force, on appeal, to cause a reversal, unless the reviewing court feels, not simply that the mistake possibly influenced the jury against defendant, but that it is strongly probable the verdict rendered reflected such adverse influence.

Argued November 22, 1926. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

Appeal, No. 267, Jan. T., 1926, by defendant, from judgment of O. & T. Phila. Co., Feb. T., 1926, No. 237, on verdict of guilty of murder of the second degree, in case of Commonwealth v. David L. Marshall. Affirmed.

Indictment for murder. Before McDEVITT, J.

The opinion of the Supreme Court states the facts.

Verdict of murder of the second degree, on which the prisoner was sentenced to not less than ten years and not more than twenty years. Defendant appealed.

*Errors assigned* were (1-42) various rulings and instructions, quoting record.

*Abraham Wernick,* of *Evans & Wernick,* for appellant. —It was error to charge that defendant is to be acquitted only if death was caused by an enema containing poison by mistake without any plan or action on the part of defendant.

It was error for the court to charge that the burden shifts from the Commonwealth to defendant to show the killing was of a less degree than murder: Com. v. Lee, 226 Pa. 283; Com. v. Ross, 266 Pa. 580; Com. v. Berkenbush, 267 Pa. 455; Com. v. Deitrick, 218 Pa. 36.

The court erred in its instructions as to the confessions: Com. v. Mosler, 4 Pa. 264; McClain v. Com., 110 Pa. 263; Braum v. U. S., 168 U. S. 532.

It was error to fail to adequately present issues involved in defendant's testimony: Goersen v. Com., 99 Pa. 388; Com. v. Silcox, 161 Pa. 484; Com. v. Goldberg, 4 Pa. Superior Ct. 142; Com. v. Croson, 243 Pa. 19.

It was error to admit conversations between deceased and third persons in absence of defendant on day of alleged killing: People v. Carkhuff, 24 Cal. 640; Weyrich v. People, 89 Ill. 90; People v. Irwin, 77 Cal. 494; Montag v. People, 141 Ill. 75.

It was error to refuse to admit medical testimony as to the technical meaning of "History of case" and the effect of an enema.

It was error to refuse requests for withdrawal of a juror: People v. Davis, 52 Mich. 569; Fite v. Bennett, 142 Ga. 660; Granger v. Warrington, 3 Gilman (Ill.) 299; Lange v. Perley, 47 Mich. 352; People v. Roach, 215 N. Y. 592.

The jurisdiction of the court may not be shown by confession of defendant: Com. v. Kaiser, 184 Pa. 493;

Com. v. Walker, 3 Pa. Dist. R. 534; Com. v. Ketner, 92 Pa. 372.

*Charles F. Kelley,* Assistant District Attorney, and *Charles Edwin Fox,* District Attorney, for appellee.— Whenever one's state of mind at a given time is material, whether as a principal fact or as an evidentiary fact, contemporaneous declarations are admissible to prove it. Similarly, the declarations of deceased as to a present intention are admissible as part of the res gestæ when the intention in declarant's mind is relevant: Com. v. Palma, 268 Pa. 434; State v. Long, 123 Atl. 350; Sapp v. State, 87 Tex. Cr. 606.

The facts in question assumed must be stated as facts; it is not proper to include in the hypothesis statements that a third person has certain opinions or had made certain statements concerning the matter in controversy: Barber's App., 63 Conn. 393.

It was the jury's duty, after hearing the facts in the case and the opinions of the expert, upon the facts stated hypothetically, where they had no personal knowledge of the facts, to decide whether or not the deceased woman died from compression of the neck: Coyle v. Com., 104 Pa. 117; Wissinger v. Coal Co., 271 Pa. 566; Sloss Sheffield S. & T. Co. v. Steel Co., 156 Ala. 284; Crozier v. Ry., 106 Minn. 77; Yardley v. Cuthbertson, 108 Pa. 395; Dexter v. Hall, 82 U. S. 9.

It is not error to incorporate in a hypothetical question an opinion of another expert witness: Louisville N. A. & C. Ry. v. Falvey, 104 Ind. 409, 3 N. E. 389; Barber's Est., 63 Conn. 393, 27 Atl. 973; Guiterman v. Ins. Co., 83 N. Y. 358; Parrish v. State, 139 Ala. 16, 36 So. 1012; Crozier v. Minneapolis, etc., Co., 106 Minn. 77, 118 N. W. 356.

Slight inaccuracies, doing no substantial hurt to the prisoner, ought not to turn aside the course of justice: Laros v. Com., 84 Pa. 200, 208; Com. v. Daily (No. 2), 280 Pa. 59.

OPINION BY MR. CHIEF JUSTICE MOSCHZISKER, December 6, 1926:

Defendant, David L. Marshall, a chiropractor, who maintained an office in Philadelphia, was charged with the murder of Anna May Dietrich. A jury in the court below found him guilty of murder of the second degree. From a mass of evidence, the following facts, sufficient for the purpose of this opinion, are taken as a brief history of the case.

Dismembered parts of the body of deceased were found in a lonely section of Delaware County, about four miles from Media; two days later, the head, severed from the body, was discovered hidden under a railroad trestle over what is known as Naylor's Run in Upper Darby, several miles away from Media. The following day, January 24, 1926, the Delaware County police authorities took defendant into custody, and on January 25, 1926, turned him over to the police authorities of Philadelphia County.

At the public prosecutor's office in Philadelphia, the prisoner made a confession, to those who had him in charge, in the presence of the district attorney, in which he admitted dismembering the dead body of Miss Dietrich, but denied any responsibility for her death. Defendant said that he had taken deceased into his office, after finding her in a fainting condition in a toilet nearby, and, on attempting to revive her, discovered that she was dead.

Certain of the police officers, together with the district attorney, left Marshall at the conclusion of this confession. Within two hours thereafter, the chief county detective was summoned to the district attorney's office, when, according to the testimony of this officer, defendant stated that the story he had previously told was not true, and proceeded to make a second confession. This, in brief, was to the effect that deceased had come to him for a chiropractic treatment, during which a vertebræ became dislocated and she had immediately died as the

result.   He said nothing in his second confession, about disposing of the body.

Marshall had barely finished this second story when the district attorney returned; whereupon defendant, being interrogated, disavowed both of his former confessions, to the extent that they explain how the woman had died, and made a third and greatly different statement, which was reduced to writing, signed and sworn to by him.   The substance of this was: For a number of years he had been having illicit relations with the deceased, which he determined to end; she came to his office the evening of January 19, 1926, and asked him for money; they quarrelled, and he took her by the throat,—in his words, "to give her a scare"; she screamed, whereupon he stuffed handkerchiefs into her mouth and continued to choke her, until she was dead.

Marshall claimed, however, that he did not intend to kill and did not realize that he was choking his victim to death; that, being seized with fear of serious misunderstanding, should the body be found in his office, he drained off the blood, dismembered the remains, wrapped the parts in separate bundles, and took them to the places where they were subsequently discovered.

When the case came to trial, defendant repudiated much that he had previously said, and stated that the woman had died in his office because of a disorder from which she was suffering when he found her there.   He attempted to establish, by circumstantial evidence, the probability that she had come to her death through the accident of using, instead of common salt, a poisonous compound containing cyanide of potassium, in a solution which she had administered to herself as an enema; that he had found her when she was dying, and, as he had before confessed, subsequently dismembered the body.

Considerable evidence was presented in support of the theory of accidental death, but it is unnecessary to review it here.   Suffice to say, this evidence, along with the confession of defendant that he had choked his victim

to death, was passed on by the jurors, who, by their verdict, very properly refused to accept the theory that deceased had died from an accidental cause.  The unquestioned facts as to the dismemberment and disposal of the body are more consistent with a consciousness of guilt than with the apprehension which defendant claimed to have motivated him in treating the corpse in the inhuman manner shown by the proofs before us,— no doubt the jury so believed; but, be this as it may, the verdict shows the jury found, as they were warranted in doing, that, when defendant took deceased by the throat, he wickedly intended to do her great bodily harm, even though he may not have intended to kill her; this would be murder of the second degree.

When the defendant's confession that he had choked deceased to death "in the City of Philadelphia on January 19, 1926," was offered in evidence by the Commonwealth, his counsel objected to its admission on the ground that the question of the locus of the crime, as establishing jurisdiction, is "part and parcel of the corpus delicti," which must be proved independent of confessions by the accused.  The court overruled this objection and granted an exception.  The first question for determination, then, is whether the confession was properly admitted.  This reduces itself to the inquiry, Was there evidence sufficient, aside from defendant's confessions, to show that a crime had been committed? Here the circumstances of the finding of the body and its condition were clearly consistent with and indicated a homicide; though they may have been explainable on other theories, this state of the proofs warranted the admission of defendant's confessions for the purpose of connecting him with the crime (Com. v. Bishop, 285 Pa. 49, 53), and, as well, to show where it was committed.  In addition, all proof of the locus of the crime is not contained in defendant's confessions; his own testimony given at the trial admits that the death occurred in his office.  Besides, we have the corroborative

circumstances that the victim's head was found wrapped in a piece of the "Evening Bulletin" of Sept. 11, 1924, a date some sixteen months prior to the offense; and that a bloody piece of a "Bulletin" of the same date was found in a refuse can in the lavatory adjoining defendant's office in Philadelphia. Thus it may be seen that there was evidence of the locus of the crime, without regard to the confessions; but, in saying this, it is not to be taken that we agree that proof of the place where a crime was committed is an essential part of the corpus delicti. Defendant's counsel admits he can furnish no authority for his attempt to engraft the necessity for such proof on the rules governing the doctrine of corpus delicti, and we see no cause for doing so in this case. The rules in question are designed to protect accused persons from conviction where, in point of fact, no crime has been committed (Com. v. Gardner, · 282 Pa. 458, 463), and they cannot properly be made to include mere jurisdictional matters. The requirements of corpus delicti are enumerated by Wigmore on Evidence, vol. 4, section 2072; and they are not to be enlarged.

In the course of the trial, one Bennett J. Gleason was called as a witness for the Commonwealth. Gleason testified that he and Miss Dietrich sat together on a train going from Philadelphia to Chestnut Hill, on the morning of the day of the latter's death. Then the district attorney said to the witness, "Go on and tell what conversation you had with her and what happened at that time." After the court had overruled a general objection from defendant, Gleason detailed a conversation, the salient points of which were statements of the deceased that she was going to meet defendant that evening, and also that, "The chap I am meeting this evening will no doubt object strenuously to me going [to an affair on the next evening] because I am going with another man." No special objection was made to any portion of this testimony, and no motion was made to strike it out in whole or in part.

Defendant now urges that the testimony might have done him harm and therefore he should have a new trial.   Since the only objection entered was a general one, acceptance of the evidence will not be adjudged erroneous if it was competent for any purpose: Cullum v. Wagstaff, 48 Pa. 300, 303; Dietrich v. Davies, 274 Pa. 213, 216; Murray v. Frick, 277 Pa. 190, 195.   The objection was treated at the trial, by all concerned, as an objection to the admission of the conversation, and the inquiry as to "what happened" is not significant.   We are of opinion that the conversation was admissible, in connection with other evidence in the case, to show the intention of the deceased to meet defendant that evening: Ickes v. Ickes, 237 Pa. 582, 592-3.   Miss Dietrich's going to Marshall's office, the place where she came to her death, is, of course, relevant to the case.   That she did go there was stated and admitted repeatedly by Marshall, and therefore evidence of her intention to do so is at least corroborative, and from this point of view it could have done defendant no harm; but proof of intention may be received for more than mere purpose of corroboration. In a case cited by us in Ickes v. Ickes, supra (at pages 593-4), it was held that "Evidence of what a person's intentions were is relevant circumstantially to show that he afterward carried out his designs"; further, that such intentions could be proved by the person's declarations.   There, as here, the person in question was the victim of a homicide; and the declarations were offered to show the deceased's "intention and purpose to meet the defendant on the day of the murder."

It must be recognized, however, that some confusion is present in the authorities as to the circumstances under which declarations of the character we are now discussing may be admitted to show intention.   The question is frequently dealt with as one of res gestæ (see Com. v. Palma, 268 Pa. 434; Hunter v. State, 40 N. J. L. 495, 536; State v. Hayward, 62 Minn. 474, 65 N. W. 63, 65; 3 Wigmore, Evidence, section 1726), but such

evidence is more correctly supportable on another basis. In many of the decided cases treatment of the problem as one of res gestæ did not affect the result reached, since the elements of res gestæ were present, as, for instance, in the three cases just cited; but in other instances, such treatment might result in the exclusion of admissible evidence: see Wigmore, supra, section 1726.

Intention, viewed as a state of mind, is a fact, and the commonest way for such a fact to evince itself is through spoken or written declarations. It is, therefore, because of the impossibility, in many cases, of proving intention apart from personal declarations, that they are admitted. The true basis of their admission, then, is necessity, because of which an exception to the hearsay rule is recognized, rather than that they are part of the res gestæ: Ickes v. Ickes, 237 Pa. 582, 593, 594; Com. v. Trefethen, 157 Mass. 180, 31 N. E. 961; Mut. Life Ins. Co. v. Hillmon, 145 U. S. 285, 295; State v. Hayward, 62 Minn. 474, 65 N. W. 63, 70; Wigmore, supra, sections 1725, 1726. On this basis it is immaterial whether or not the declaration accompanied and was part of a relevant act: State v. Hayward, supra; Wigmore, supra.

The circumstances in regard to the declarations offered in State v. Hayward, just cited, were very similar to those here involved, and therefore the following language of the concurring opinion of START, C. J., is particularly appropriate to the present case. He said (65 N. W. at p. 70), "The evidence to the effect that [deceased] stated,......some two hours before her murder, that she had a business engagement that evening with defendant, was not admissible,.....on the ground that ......it was part of the res gestæ,—for the reason that her statement neither accompanied nor characterized any act relevant to the issue; but it was relevant to the issue to show that she did meet the defendant, and evidence of her declaration of an intention and purpose to meet him was admissible as original evidence to prove that she did in fact intend to meet him......To sustain

[admission of the testimony] on the ground that the statement of the deceased was part of the res gestæ is, in my judgment, to assign a wrong reason for a correct conclusion, which may lead to complication in future cases."

We do not mean to say that evidence of the kind here in question is admissible under all circumstances. Ordinarily, it should not stand alone; it ought to be accompanied by other, not inconsistent, evidence, and to the trial judge must be left the discretion of rejecting it in proper cases: see Com. v. Trefethen, supra, at p. 184; Wigmore, supra. Under the circumstances of the present case, no error was committed by admitting the testimony here in controversy. Defendant cites Com. v. Palma, 268 Pa. 434, 437, to sustain his contention to the contrary. That case, however, is an instance where the declarations were treated by us as made while the declarant was actually starting the act concerning which he expressed an intention; hence what he said on the occasion was part of the res gestæ, and, consequently, the question of when statements unaccompanied by an act might be admissible was not properly before the court for decision.

Finally, the presence in evidence of the statements now objected to would not constitute reversible error even if their admission had been technically incorrect. With Marshall's repeated admission that the deceased came to his office, proof that she intended to go there certainly could not harm him. But it is contended the conversation was used as showing jealousy on part of defendant because of deceased's engagement with another man for the next evening. We find nothing in the record to support this complaint. Moreover, if such a motive was improperly mentioned during the course of the trial by the prosecuting officer, we are not impressed, in the face of defendant's confession disclosing an entirely different motive, by the likelihood that its mention is to any degree accountable for the verdict. A slip of this

kind, if made, will not be allowed controlling force on appeal to "cause a reversal, unless the reviewing court feels, not simply that the mistake in question possibly influenced the jury against defendant, but that it is strongly probable the verdict rendered reflects such adverse influence": Com. v. Daily (No. 2), 280 Pa. 59, 65.

Complaint is also entered against the admission of a conversation that occurred between the deceased and one Elizabeth Rittenhouse, to which defendant objected before the subject-matter of it had been disclosed. The statements of the deceased in this instance, however, proved to have no bearing on the case, and could not have harmed defendant.

It is also contended that the trial judge erred in refusing to admit certain expert medical testimony "as to the effect of an enema and the technical meaning of 'history of the case.'" On the first point, counsel for defendant, when he offered the testimony in question, stated that his "only purpose" was to show "that the effect of *that* enema might have been sufficient to cause a swoon"; and this, so that he might argue to the jury that a colored man, who was around the premises, "might have seen her [the deceased] there and done something to her." Here counsel, by his use of the word "that," treats the taking of the enema as an established fact, instead of something still in the realm of contention. In other words, he presupposes that deceased had taken an enema just previous to her death; whereas there is no direct evidence in the case of any such occurrence, and the circumstantial evidence depended on by the accused would not warrant more than a surmise that such an event might have occurred. Then, again, on the inference that deceased took an enema, because she had the opportunity and Marshall said she thus treated herself on previous occasions, and had stated to him her intention to do so on that particular day, counsel for defendant wanted to place himself in a position where he might urge the jury

to draw a series of other inferences all leading to a finding that the colored man referred to by him had "done something" to deceased,—just what not being disclosed. Considering all the circumstances and the avowed purpose of the offer, we are not convinced that its refusal constitutes reversible error.    As to the second point, when Dr. Wadsworth, the coroner's physician, was called for the Commonwealth, he used the words, "history of the case."    The witness explained, however, that he was not employing that term in a technical sense, and he described exactly how he was using it.    On this state of facts, the trial judge did not err in refusing to allow expert testimony for defendant as to the "special significance" in the "medical profession" of "the term or phrase 'history of the case.'"

A number of assignments complain of the refusal of certain questions propounded to Dr. Henry W. Cattell, who was called as a medical expert by the accused.    At least one of the questions asked this witness concerned a subject sufficiently within common knowledge to render an expert opinion unnecessary, and, therefore, it was properly excluded: Kuhn v. Ligonier Val. R. R. Co., 255 Pa. 445, 450; Donovan v. Phila. Rapid Tr. Co., 273 Pa. 152, 157.    Other questions sought to have the witness testify that two separate autopsy reports, made by doctors who appeared at the call of the Commonwealth, did not contain sufficient evidence to warrant the conclusion that death resulted from the cause therein assigned.    These documents were obviously form reports, and they did not attempt to give more than the briefest outline of major conditions found on examination of the body.    That an attack on the conclusions of the examining physicians, as to the cause of death, could not properly be made by a critical view of these form reports is clear, and offers of testimony to accomplish this end were rightly refused.    In other instances defendant sought to have Dr. Cattell base his opinion, not on his own statement of existing facts, nor on facts embodied

in a hypothetical question, but on the testimony given by the doctors who had made the autopsies. While it is permissible for an expert to express an opinion based on nonconflicting testimony of others, where such testimony is assumed to be true (Yardley v. Cuthbertson, 108 Pa. 395, 450; Kelly v. Watson Coal Co., 272 Pa. 39, 42), this should be allowed only where the prior testimony embodies a set of facts of such completeness as to be capable of being put in the form of a valid hypothetical question. The testimony of the Commonwealth's doctors contained much of fact and much of opinion; it did not necessarily mention all the conditions existing in the body of deceased when it was examined, and, in fact, Dr. Wadsworth, the coroner's chief physician, testified that all which had been observed in making the autopsy had not been brought out in the testimony,— though there is no assignment of error complaining of an insufficient statement of facts to permit the expression of opinion by the Commonwealth's witnesses who said they deduced their ultimate opinion from all they had observed in making their autopsies. Then, some of the questions put to Dr. Cattell would have required him to draw his own conclusions of fact from the prior testimony, on which to base his opinion. This the law will not permit; opinion testimony may be given only on a set of definitely established or assumed facts; all balancing of testimony and deductions of fact therefrom must be made by the jury: Yardley v. Cuthbertson, 108 Pa. 395, 450; McDyer v. East Penn Rys. Co., 227 Pa. 641, 647; Wissinger v. Valley S. Coal Co., 271 Pa. 566, 570, 571.

Instead of having Dr. Cattell help defendant's case by pressing his own professional views on an assumed state of facts, thus rebutting the expert testimony of the prosecution, the effort was apparently to have him condemn the medical witnesses of the Commonwealth by expressing his opinion that, on the data considered by them, it could not properly be said that the death of the

deceased was attributable, as they had said, to "compression of the neck"; but practically all the questions for this purpose propounded to Dr. Cattell by counsel for defendant were leading, in the sense that they suggested the answer desired, and were objectionable on this score if for no other reason. Defendant's expert did say that, in his opinion, "compression of the neck [was] not a proper cause of death." Furthermore, he described in detail, by testimony occupying three legal-size pages, the various physical conditions and signs which usually appeared, and were to be scientifically expected, in cases of strangulation. The jury had this testimony to compare with that of the doctors called by the Commonwealth, and, with the assistance of counsel, could determine whether or not the signs and conditions described by Dr. Cattell appeared in the case. It was for them, the triers of the facts, to decide that question, not for defendant's expert to do so by answering a comprehensive and suggestive question put by counsel for appellant; who, at the end of the witness's description of what should appear in such cases, asked him to say "whether or not the 'tell-tales' which [he had] just enumerated and described......were present in the examination" that one of the doctors for the Commonwealth had made, and of which the witness had read a report. Dr. Cattell was twice permitted to say that, on the data considered by the doctor for the Commonwealth, whose testimony was under discussion, he, the expert for defendant, could not state an opinion as to the cause of death; and this, although the true test was not whether, from certain parts of the testimony for the Commonwealth, he could say what was the cause of the death, but whether or not, considering all the data shown to have been considered by experts on the other side, it could properly be told therefrom what the cause of death was, or, if you please, on that data, assuming it to be correct, whether or not he could state the cause of death. This would have given him the proper opportunity to assert,

if in his view such was the fact, that the data was an insufficient basis for an opinion concerning the cause of death, and, hence, that he could not express one, as, in point of fact, the witness said in regard to several subordinate matters during the course of his examination. Thus far, we see no reversible error.

At one point in his charge, the trial judge said: "If you believe the testimony of the defendant, that the deceased died as the result of an enema in which she used certain poison by mistake and without any plan or action on his part, he should be acquitted." Counsel for appellant construes this as though the judge had charged that the jury, in order to acquit on the theory that deceased had died as the result of a poisonous enema, would have to believe that the enema was taken not only by mistake but without any action on defendant's part, no matter how innocent such action may have been. But the answer to all this is that the charge is not properly susceptible of any such construction. As already pointed out, there is no direct testimony that this woman took an enema, poisonous or otherwise, on the day of her death, much less that it caused her demise; the evidence goes no further than to show that she might have taken an enema and that, had it been of a certain kind, it would have proved fatal. Defendant's statement, which appears in the record, that deceased told him on the fatal day that she "wished" to administer to herself an enema, together with his suggestion that, as she had previously thus treated herself in his office, she might have done so on the day in question, and that, in doing so, she might have put into the water, by mistake for salt, a poisonous substance which he had on hand, certainly was testimony to the effect that, if Miss Dietrich died as a result of an enema, it was "without any plan or action on his part"; and all that the part of the charge under attack does is to tell the jurors that, if they believed such testimony, defendant must be acquitted. He can make no proper complaint of this. Moreover, in his charge and in affirm-

ing one of defendant's points, the trial judge instructed that the Commonwealth, in order to convict, had to prove a death by violence at the hands of the accused, and exclude beyond a reasonable doubt the hypothesis that the death occurred by accident, mistake, or the act of a person other than defendant.

Several parts of the charge are assigned for error wherein the trial judge instructed that, where a homicide is proved against a defendant, the burden is on him to reduce the offense to manslaughter, or, if he contends for acquittal, to prove an excuse. There is nothing wrong with the words employed in these portions of the charge, —in fact, they, in most instances, appear to be quoted from Commonwealth v. Drum, 58 Pa. 9, and other leading cases,—but it is contended by defendant that, in the absence of specific instructions to the effect that the rule as to proof beyond a reasonable doubt did not apply to defendant, the jury might have conceived that the accused had to bear this heavy burden of proof. After reading the full charge several times, we do not feel that there is the slightest possibility that the jury could have taken such a meaning from it, and therefore we see no merit in the present complaint. The authorities cited by appellant do not control here. In all of them, the charge contained language which warranted the construction that the burden on the accused was to prove his defense beyond a reasonable doubt; but, as already stated, that cannot justifiably be said of the instructions in this case. Though the trial judge refused to read certain of defendant's requests, all of them were either covered in the general charge or so drawn as to warrant a refusal. The charge, when taken in connection with the points affirmed for defendant, sufficiently covers both the facts and the law in the case; we see no merit in defendant's complaint that the trial judge over-emphasized the Commonwealth's case and failed adequately to present the testimony and issues on defendant's side.

Defendant further complains that the court below refused a petition praying for an order that would "enable an exhumation and autopsy to be made" of the body of deceased. We might dismiss this complaint for the reason that no copy of either the petition or answer is to be found in the record brought up on the appeal. By inquiry at the office of the clerk of the court below, however, we located the original petition and answer. After reading these papers, we cannot say that the court erred in entering its order thereon as follows: "Rule discharged without prejudice to defendant." Without reciting the averments of the petition and answer, it is sufficient to say, the former did not state facts which imperatively required that its prayer be granted, and, when the averments of the answer are taken into consideration, the matter appears as one entirely for the discretion of the trial tribunal. The petition fails to disclose what it was proposed to develop through an autopsy more than had already been shown by the examination of the body made by the coroner's physician. Moreover, it does not appear that any notice was given to the near relatives of the deceased of the application to exhume her body; and this, in itself, would be sufficient to warrant the order made by the court below. We may add that, though this order permitted a subsequent application of like character, none appears to have been filed.

In the course of the trial, defendant made several requests for the withdrawal of a juror on the ground that remarks of the court and questions asked by the district attorney tended to prejudice defendant with the jury. A motion was also made, while the jury was being drawn, for a continuance, on the ground that incorrect reports of the proceedings had appeared in certain newspapers on the day before, that were of such a nature as might prejudice potential jurors. We have examined the parts of the record involved in these complaints and find no abuse of discretion.

This opinion covers the points comprehended in appellant's statement of questions involved. While each of the 42 assignments of error is not specifically passed on, we have examined all of them, as well as the testimony or parts of the record to which they relate, and, after reading the bulk of the evidence, find no reversible error.

The judgment is affirmed and the record remitted to the court below to the end that the sentence imposed on defendant may be carried out.