## Slade, Admrx., Appellant, *v*. Pennsylvania Railroad Company.

Argued November 17, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

re-argument refused February 3, 1954.

*Benjamin Bernstein,* with him *Herbert F. Kolsby* and *Robert M. Bernstein,* for appellant.

*Theodore Voorhees,* with him *George J. Hauptfuhrer, Jr.* and *Barnes, Dechert, Price, Myers & Rhoads,* for appellee.

OPINION BY MR. JUSTICE JONES, January 12, 1954:
This action of trespass was brought under the Wrongful Death and the Survival statutes to recover for the death of the plaintiff's decedent allegedly caused by the negligence of the defendant railroad company. The jury found for the defendant. The plaintiff moved for a new trial, but the court denied the motion and entered judgment on the verdict. The plaintiff thereupon took this appeal. The sole error assigned is the trial court's exclusion of testimony offered by the plaintiff in rebuttal. An understanding of the circumstances attending the accident is essential.

Washington Avenue in Philadelphia runs east and west and is intersected at right angles by 20th Street. In the middle of Washington Avenue, the defendant railroad company maintains three parallel main run-

ning tracks. There is also a cartway on either side of the avenue along the outside tracks. About 9:30 on a night in December, the plaintiff's decedent, James Slade, a young man of twenty, while running westwardly from 20th Street on the cartway along the south side of the tracks, stumbled and fell across the near rail of the southern track. At the time there was closely approaching from the east on the same track a freight train drawn by a Diesel engine. Before the train was brought to a stop, a part of the engine ran over Slade and killed him. The point of accident was 90 feet west of the 20th Street crossing. The train had been travelling at a speed variously estimated at from 3 to 10 miles per hour. Its bell had been ringing continuously and its headlight was lighted. The theory upon which the plaintiff sought to impose liability upon the defendant was that Slade had fallen across the track so far in advance of the oncoming train that it could have been stopped before reaching him and the accident thus avoided.

Just prior to the accident, Slade and Betty Waters, his basketball coach, had been walking north on the east side of 20th Street toward the Washington Avenue grade crossing. According to Betty, they "were coming home from a basketball game." Both resided north of the Washington Avenue crossing. When they got to Alter Street, which is the first street south of Washington Avenue, Slade said, "Miss Waters, I am in a hurry." He then "trotted" across to the west side of 20th Street and ran north to the cartway on the south side of Washington Avenue where he turned west onto the cartway along the southern railroad tract as already described.

In an effort to counteract a very compelling inference from other evidence in the case that Slade had tripped on a spur-siding rail and fallen across the

track in an attempt to run around the front of the slowly moving train, the plaintiff sought to prove in rebuttal that Slade was at the time of the accident on his way to call upon a girl friend named Lillian Macey who lived at 938 South 23rd Street which was north of the tracks and 3 blocks west of the 20th Street crossing. It was counsel's evident purpose to argue on the basis of such testimony that Slade was running along the south side of the tracks, intending to cross either at the 21st, 22nd or 23rd Street crossing. And, thus, he would be exculpated from an imputation of contributory negligence if he were not to be found guilty of having tested an obvious danger by trying to cross the railroad tracks in the face of the imminently approaching train. The witnesses whom the plaintiff proposed to call for the purpose of establishing Slade's intention were Lillian Macey, who, it was said, would testify that, when Slade left her at the conclusion of a visit the evening before, he had declared his intention of visiting her again the next evening after basketball practice, and Betty Waters who was the last person to talk with him.

It is unnecessary for us, however, to decide whether the proffered testimony, although hearsay, was nonetheless competent in the circumstances (see, e. g., *Commonwealth v. Marshall*, 287 Pa. 512, 522, 135 A. 301) or whether it qualified as rebuttal. If the defendant railroad was guilty of the type of negligence contended for by the plaintiff, it was immaterial whether or not the deceased had been guilty of contributory negligence. Hence, the exclusion of the proffered rebuttal did the plaintiff no harm. The only negligence on the part of the defendant suggested by the plaintiff was that the train could have been stopped in time to avoid running over the fallen young man. Whether it could have been was the basis upon which the

case was tried and submitted. The trial judge fairly and appropriately instructed the jury,—"Now, the theory of the plaintiff appears to be this, that however that boy got on the track, whether it was through his own carelessness in trying to run in front of it and accidentally stumbling and knocking himself dizzy by hitting his head on the rail—however he got there, he was there so long ahead of the train that the train should have been stopped in time. . . . Now to sum up on this branch of the case, if that boy ran across the front of the train so close to it that the train could not be stopped in time, the railroad company has done nothing wrong and your verdict must be in favor of the defendant. On the other hand, if he went across there, *even if he was careless,* and fell when the train was so far away that it could have been stopped and it wasn't stopped, then your verdict would be in favor of the plaintiff because the defendant had done something wrong, was careless, it should have stopped its train. And [as] I said that is true *even if the boy is careless because then his carelessness wasn't the cause of the accident,* it wouldn't be what we call in law the proximate cause" (Emphasis supplied).

The plain implication of the jury's verdict is that this unfortunate accident did not result from any negligence on the part of the railroad company. The case was fully tried and was submitted to the jury with utmost fairness and impartiality. The evidence well justified the verdict and no valid reason for disturbing it has been advanced.

Judgment affirmed.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The majority opinion in this case lingers on a siding and misses the issue on the main track of appeal.

The matter in dispute is not whether James Slade was guilty of contributory negligence, but whether the train crew allowed a locomotive to run over James Slade as he lay helplessly across the tracks, when, by the exercise of care under the circumstances, they could have avoided killing him.

There were two theories in the case as to how the tragic accident came about. The plaintiff presented evidence to the effect that James Slade, 20 years of age, while running alongside the railroad track, tripped and fell. He picked himself up, apparently dazed, finding difficulty in standing, but, in forcing himself to stand erectly and walk, he stumbled again, staggered, and this time fell to his side on to the tracks. The defendant, on the other hand, maintained that the youth ran in front of the train, trying to "beat it across," and was cut down by the locomotive because there was not enough time within which to stop the train before the striking.

The majority opinion quotes from the Trial Judge's charge wherein the Judge states the alternative jury findings possible, and, with this quotation, cursorily disposes of the case. But even if the Trial Court's charge were formally correct, this still would not remedy the serious error committed in the trial. Before one can produce flour there must be wheat in the mill.

The Judge's charge was based on a vacuum. He excluded from the trial the evidence needed to enable the jury to decide whether James Slade ran in front of the train or involuntarily fell in its path. The plaintiff's contention was that when the boy tumbled to the tracks the train was so far away that the train crew committed gross negligence by remorsely moving forward in callous indifference to a prostrate body lying on the rails. The plaintiff produced evidence to show

that when James fell, the train was 116 feet away. To this was added testimony that the train could stop within 10 feet, so that from the plaintiff's point of view the snuffing out of the life of James Slade could have been avoided even if ordinary care had been exercised by those in charge of the train.

It is to be noted, in the majority opinion's quotation from the Trial Judge's charge as to the alternative findings by the jury, that the Judge placed in each alternative the proposition that the boy voluntarily committed himself to the crossing over the tracks. This absolutely prejudged the case because if the jury had no choice but to find that the boy *purposely* went before the moving train, the plaintiff could not possibly recover. But the plaintiff vigorously contested this view. It was to defeat this very contention of the railroad company that the plaintiff offered to prove by two witnesses that the goal of the boy's journey that night rested at a point which did not require him to cross the tracks at 20th Street. The 20th street crossing runs north and south. Washington Avenue, which accommodated the railroad tracks, runs east and west. James Slade lived at 1012 South 20th Street which is *North* of the tracks. If James Slade was on his way to his home it would be a normal thing for him to cross the tracks at 20th Street. However, if he was on his way to see his sweetheart, who lived at 938 South 23rd Street, there would be no necessity for him to cross at 20th Street because he could cross at 21st, 22nd, or 23rd Street. Daring as a young man may be, he still will not contest the right of way with a locomotive when there is no urgency for him to pit his wits against so monstrous an adversary. Thus arose the imperative need, in the ascertainment of truth and justice, to determine whether the boy was going to his mother's home or to his sweetheart's home.

The Trial Judge refused to allow any testimony on this subject and by doing so deprived the jury of evidence sorely needed in reconstruction of the accident for the purpose of fixing blame. The trial was so conducted that the jury was forced to the extremity of deliberating on guesses, conjectures and surmises. It cannot be said, however, that the jury was not aware of the deficiencies in the evidence. With all respect to the Trial Judge the thought may be ventured that the jury was more alert as to what was needed than the Judge. At the termination of the Court's charge, one of the jurors stood up and asked the Judge some pointed questions: "JUROR NO. 9: Where did the plaintiff live at the time of his death? THE COURT (addressing counsel for plaintiff:) One of the jurors would like to know where the plaintiff lived at the time of his death. MR. BERNSTEIN: 1012 South 20th Street. JUROR NO. 9: Did the boy have to cross the tracks to go home? THE COURT: I believe that would be in the evidence."

But it was not only No. 9 juror that was seeking a lantern of light to dispel the darkness which enveloped the vital problem the jury had to decide. Juror No. 4 was equally solicitous. When defendant's counsel was leaving the courtroom at a luncheon recess, Juror No. 4 came up to him and asked where the deceased had lived. The lawyer walked away without answering. Later, when Juror No. 9 asked the same question in Court, No. 4 Juror turned to this same lawyer and remarked: "You see, that's all I wanted to know."

These jurors would not have been so baffled had the Judge permitted evidence as to James Slade's course of travel that evening. Plaintiff's counsel offered to establish that on the night before the accident James had told Lillian Macey that he was going to visit her after the basketball game on Monday evening (the night of the accident). The Trial Judge

cavalierly disposed of this serious proposal by saying in his opinion: "The mere fact that the decedent told Lillian, twenty-four hours before he was killed, that he would visit her the next night was too far removed in time to warrant admitting the evidence; he might have changed his mind a dozen times and may even have changed girls."

At 20 years of age, youth is not so fickle that within the space of 24 hours, for no stated reason, a lad breaks off a 4 to 5 years' friendship of the heart. Anyway, it was not for the Judge to pass categorical judgment on this association of sentiment—without evidence. And then, if the Trial Judge excluded Lillian Macey's testimony because of the 24 hour interval with what he regarded its potential mutations of spirit, why did he exclude the testimony of Betty Waters who was prepared to testify that just as James was leaving her at 20th and Alter Streets, *a minute or two before he was killed,* he told her he was in a hurry to get to the home of his sweetheart, Lillian Macey?

The Trial Judge said in his Opinion that he could not permit the testimony under discussion because "it is impossible for us to perceive the relevancy of the described testimony." The relevancy was very obvious because James' pedestrian destination that night was the hinge on which the gate of possibilities swung as to whether he struck across the tracks or proceeded alongside them. Furthermore, if offered evidence is competent at all, it is admissible even though its purpose be not stated. "It is not necessary that the object of evidence tendered be stated by the party offering it, unless it is asked either by the opposite party or the court. Should the object be neither asked nor stated, and it no wise appear, if the evidence is rejected, *its admissibility for any purpose is sufficient to impugn the decision of the court.*" (Moschzisker's Trial by Jury, page 135.) (Emphasis supplied.)

The majority opinion refers to this proffered testimony as hearsay, but while technically hearsay it is competent testimony as the Court concedes through its reference to the case of *Com. v. Marshall,* 287 Pa. 512, where this Court said: "Intention, viewed as a state of mind, is a fact, and the commonest way for such a fact to evince itself is through spoken or written declarations. It is, therefore, because of the impossibility, in many cases, of proving intention apart from personal declarations, that they are admitted. The true basis of their admission, then, is necessity, be cause of which an exception to the hearsay rule is recognized, rather than that they are a part of the res gestae."

In *Com. v. Palma,* 268 Pa. 434, we said: " 'One departing from home may have in view any conceivable place, or any conceivable purpose, as his destination or object. The act of departure is thus in itself of the most ambiguous character; it does not afford the slightest cue as to the object of the journey; it is natural and usual—according to the common experience of mankind—that the party should say something respecting his departure, of an explanatory character. Declarations thus made are a part of the act itself.' "

If destination, upon the departure from home can be, as it is, a subject for inquiry and evidence in given circumstances, how much more so is it relevant when the wayfarer is stopped at a crossroads, which, depending on intentions, could lead to one of a number of destinations?

The majority is of the opinion that the exclusion of the proffered testimony did the plaintiff no harm. I am of the opinion that it did maximum harm, and, in all probability, caused the jury to return a verdict against the plaintiff. There is no doubt in my mind

that the exclusion deprived Dorothy Slade, mother and administratrix of the estate of James Slade, of the opportunity to present all the evidence in the case so that she could at least be assured that she had had her full day in court which, I respectfully assert, she did not have.

I accordingly dissent.