# Goldsboro v. Loyal Protective Insurance Company, Appellant.

*Insurance—Life insurance—Voluntary exposure to unnecessary danger—Fighting—Directed verdict—Evidence.*

In an action of assumpsit on a policy of life insurance, the evidence established that the insured was killed in a shooting affray. The policy provided that indemnity should not be payable for injuries or death resulting from "voluntary exposure to unnecessary danger; or—while fighting—or while engaged or as a result of having been engaged in any unlawful act." There was evidence that for two months prior to the shooting, a state of enmity existed between the insured and his assailant, resulting from the former's attention to the latter's wife, and that on the morning of the shooting the insured armed himself with a revolver, and approached the house of his assailant. When about forty yards from the house the insured was told "to stop, that he came far enough." Instead of withdrawing, the insured pointed his revolver at his assailant, at which time the latter shot and inflicted the injuries which resulted in the death of the insured.

Such evidence was sufficient to support a finding that the insured exposed himself to unnecessary danger and the case should have been submitted to a jury. It was error for the trial Court to direct a verdict for the plaintiff.

*Evidence—Admissibility—Motive.*

In such case it was error to exclude evidence that the insured exhibited a gun to a third party a day or so before the shooting, and threatened to end the life of his assailant. Evidence to the effect that the insured stated "he would go through hell for that woman, (the assailant's wife) and admitted improper relations with her," was also admissible in evidence.

Such evidence was relevant to show the insured's state of mind and his mental attitude toward his assailant; an essential element in the circumstances constituting the tragedy.

Argued April 17, 1928. Appeal No. 797, April T., 1928, by defendant from judgment of C. P., Fayette County, September T., 1924, No. 218, in the case of Blanche Goldsboro v. Loyal Protective Insurance Company. Before PORTER, P. J., HENDERSON, TREXLER, KELLER, LINN, GAWTHROP and CUNNINGHAM, JJ. Reversed.

584 GOLDSBORO *v.* LOYAL PROTEC. INS. CO., Appel.

Statement of Facts—Opinion of the Court. [93 Pa. Superior Ct.

Assumpsit on a policy of life insurance. Before HUDSON, P. J. and HENDERSON, J.

The facts are stated in the opinion of the Superior Court.

The Court directed a verdict for the plaintiff in the sum of $1,663.50, with interest, and entered judgment thereon. Defendant appealed.

*Errors assigned,* among others, were to various rulings on evidence and the charge of the court.

*Linn V. Phillips,* of *Playford & Phillips,* for appellant.

*Buell B. Whitehill,* of *Jones, Whitehill & Lane,* and with him *Sturgis & Sturgis,* for appellee.

OPINION BY LINN, J., July 12, 1928:

Ralph Goldsboro was insured by an accident insurance policy dated February 23, 1923. He was shot December 26, 1923 and died January 10, 1924 as a result of the shooting. The policy provided for the payment of $1,500 to the plaintiff, "if the death of the insured occurs ........ as a result of, and within ninety days after occurrence of an injury, causing total disability immediately and continuously until death." It was also agreed that "Indemnity shall not be payable for injuries, or death resulting therefrom, intentionally inflicted upon himself by the insured; ...... or for voluntary exposure to unnecessary danger; or for injuries or death received while engaged in aviation or while fighting, wrestling or while engaged or as a result of having been engaged in any unlawful act; ......"

Goldsboro's widow sued on the policy. Defendant denied liability alleging death resulted "from voluntary exposure to unnecessary danger; or ...... while fighting ...... or while engaged or as a result of

having been engaged in any unlawful act ...... ''

At the trial plaintiff read in evidence parts of her statement of claim not denied in the affidavit of defense and rested. Defendant then assumed the burden of showing that Goldsboro intentionally exposed himself to unnecessary danger, sought and got into a fight and died as a result. If that were shown plaintiff could not recover. "Under the words of the policy the death of an insured would not be effected by accidental means if it were the natural and probable consequence of his own act, and should have been foreseen. It would not be accidental if the result of a duel or a deadly assault commenced by him where he had reason to expect a deadly defense and generally where by his conduct he had invited violence, the reasonable consequence of which he should have anticipated": Erb v. Commercial M. Acc. Co., 232 Pa. 215, 217; see also Biehl v. General A. I. Corp., 38 Pa. Superior Ct. 110, 114; Bowers v. Great Eastern C. Co., 260 Pa. 147. Defendant called a witness, Grimm, to testify to the shooting and two other witnesses. Plaintiff then called witnesses in rebuttal. The trial judge excluded certain offers of evidence by defendant and directed a verdict for the plaintiff; both rulings are complained of here.

If the evidence were uncontradicted that Goldsboro died of an accidental shooting, binding instructions would have been correct; but there is evidence from which the jury might have found that the shooting was within the exception quoted from the policy, that death resulted "from voluntary exposure to unnecessary danger or ...... while fighting ......;" that evidence should have been submitted to the jury with appropriate instructions on the subject. Grimm's account of the shooting contradicts that of plaintiff's witnesses called in rebuttal. For the purpose of deciding whether or not binding instructions for plaintiff should have been given, we must therefore assume

that the jury might have accepted Grimm's account, and from it, have found that the shooting was the consequence of intentional exposure to unnecessary danger or of a fight within the terms of the contract. In passing on this point we consider, at first, only the evidence received, though it will appear that if the evidence offered and excluded had been received, there would be additional reason for submitting the case to the jury.

From Grimm's evidence the jury might have found that he lived in a village in a house fronting on street A, at the north corner of its intersection with street B, the streets being 40 feet wide. Goldsboro lived nearby. There had been trouble between the two men prior to December 26, 1923, said to have grown out of Goldsboro's attentions to Grimm's wife. About 8 A. M. December 26, Grimm, who was in his house, saw Goldsboro walking on street A towards the house. Seeing Goldsboro "coming around a corner at the crossroads [the intersection of streets which for convenience we have called A and B] toward my house," Grimm got his shot gun and went into his back yard. As Goldsboro approached the house Grimm "told him to stop, that he came far enough." Q. "What did Goldsboro do then?" A. "Pulled a gun." Q. "You mean a revolver?" A. "Yes sir." Q. "What did he do with the gun?" A. "Well he pointed it towards me ......" Q. "Did you have a gun at that time?" A. "I did." Q. "Which of you was the first to draw the gun?" A. "Goldsboro." Q. "What did you do at that time?" A. "I pulled mine and shot." Q. "What did Goldsboro do then?" A. "He shot." When the first shot was fired the men were "35 or maybe 40 yards" apart. A number of shots followed. Goldsboro was taken to a hospital where he died. Grimm was indicted, convicted of manslaughter and served his sentence in the Western Penitentiary.

Prior to the shooting, for about two months at least,

a state of enmity resulting from Goldsboro's attention to Grimm's wife had existed and was recognized by both men. Notwithstanding this hostility, Goldsboro armed himself with a revolver and approached Grimm's house, until at a point 35 or 40 yards from Grimm, then in his back yard, Goldsboro was told "to stop, that he came far enough." Instead of withdrawing he produced his revolver and pointed it at Grimm. The evidence so outlined, though contradicted by plaintiff's rebuttal witnesses, is sufficient, if believed, to support a finding that Goldsboro in the circumstances intentionally exposed himself to unnecessary danger of which he was fully conscious; and also that he had put himself in a position where he thought a fight would result, for which he would arm himself. For death so resulting, indemnity was not payable.

We also think there was error in rulings on evidence. After Grimm testified that he had "caught him [Goldsboro] coming to my home" at five o'clock in the morning of October 31, the court struck out the testimony, saying that Grimm could not "prove any incriminating circumstances against his wife." Defendant made an offer to prove by a witness, Christopher, that "a day or so before the shooting on December 26, 1923, that the insured, Goldsboro, exhibited a gun to him and threatened to end the life of Grimm, for the purpose of showing that the death was not accidental but the result of a duel or a deadly assault commenced by Goldsboro and generally whereby his conduct he had invited violence, the reasonable consequences of which he should have anticipated." The court rejected the evidence because the threat was not communicated to Grimm. This evidence should have been received; it was relevant to show Goldsboro's state of mind, his mental attitude toward Grimm, an essential element in the circumstances constituting the tragedy. Communication of the threat to Grimm might have been important if Grimm were defending

himself, but that was not the issue on trial. The question was—and defendant was entitled to offer evidence to show the fact—whether in the circumstances Goldsboro's approach to Grimm's house, armed with a gun which he drew, was such intentional exposure of himself to danger or to a fight as to bring himself within the exemption from liability. The threat was some evidence of his purpose and intention to be considered by the jury with the rest of the testimony: Ickes v. Ickes, 237 Pa. 582, 590, etc.; Gilchrist v. Bale, 8 Watts 355, 357; Com. v. Marshall, 287 Pa. 512, 521; Wiggins v. People, 93 U. S. 465, 470; Wigmore, Evidence Vol. 1, sections 105, 107, 108, 111, 1725, 1730.

For the same reason it was wrong to refuse to permit the witness Guthrie to testify to his conversation with Goldsboro a short time before, in which Goldsboro said "he would go through hell for that woman [Grimm's wife] and admitted improper relations with" her.

The basis of appellee's argument and the ground of the decision below, is that Goldsboro acted in self defense in resisting or repelling an attack which he had no reason to expect would be made; of course if the jury so finds, plaintiff will be entitled to recover. We now only hold that defendant produced evidence which should have been submitted to the jury and that relevant evidence was excluded.

The judgment is reversed and a new trial is awarded.

HENDERSON, J., dissents.