Commonwealth *v.* Wilson, Appellant.

Argued November 19, 1958. Before JONES, C. J.,
BELL, MUSMANNO, JONES, COHEN and BOK, JJ.

reargument refused February 20, 1959.

590

*Louis F. McCabe,* with him *Joseph J. Cronin,* for appellant.

*Juanita Kidd Stout,* Assistant District Attorney, with her *Theodore B. Smith, Jr.,* Assistant District Attorney, *James N. Lafferty,* First Assistant District Attorney, and *Victor H. Blanc,* District Attorney, for appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, January 5, 1959:

Midmorning on July 4, 1955, a maid found in a room in the Adelphia Hotel, Philadelphia, the dead body of Lulubell Rossman, a widow 76 years of age and a longtime resident of that hotel. Mrs. Rossman's arms and legs were bound with 2 inch adhesive tape and stockings and her mouth gagged; her death was due to strangulation at the hands of some person or persons and the time of death fixed at approximately 6-7 p.m. Sunday, July 3, 1955. There was evidence of attempted robbery; open handbags were present in the room, a bureau drawer was open and clothes were laying on a chair beside the body. From that incident stemmed the events which eventually led to the conviction of Raymond P. Wilson, appellant, of murder in the first degree with the penalty affixed at life imprisonment, the conviction which forms the basis of this appeal.

Mrs. Rossman was the widow of Palen Rossman, an accountant, who died September 7, 1953 leaving an es-

tate in excess of $400,000. Subsequent to her husband's death, Mrs. Rossman lived in Overbrook and later at the Adelphia Hotel. An eccentric and somewhat unusual person, usually she had with her, either on her person or in her room, large quantities of money, particularly in new $100 bills.

In April 1954, while in Florida, Mrs. Rossman met a Reverend Ridgeway and his mother, the former being engaged in evangelistic work on the Island of Jamaica, and Mrs. Rossman became interested in Rev. Ridgeway's work. She purchased for him a pick-up truck costing $1565, a travelling van costing $4400, a house trailer costing $5700, and contributed $4359 toward his church in Jamaica. Sometime later Mrs. Rossman grew suspicious of Rev. Ridgeway and asserted to various persons that he had taken from her approximately $20,000. Through a Mrs. Coleman, a nurse in the jail at Dade County, Florida, Mrs. Rossman became acquainted with one Paul Huizenga, a Dade County deputy sheriff, in November 1954, and requested his official aid in an investigation of Rev. Ridgeway. Huizenga and one R. W. Thomas, another deputy sheriff, investigated Mrs. Rossman's claims and, after interrogating Rev. Ridgeway, became convinced that the matter involved no breach of the law. In January or February, 1955, Mrs. Rossman engaged Huizenga in a private capacity to keep Rev. Ridgeway under surveillance and in March or April, 1955 Huizenga turned the matter over to his fellow deputy Thomas. From that time on various telephone calls were made by Mrs. Rossman, particularly from Philadelphia, to Thomas or Huizenga in Miami and several days before her death she sent a $250 money order to Thomas for the services of both Thomas and Huizenga.

The theory of the Commonwealth was that Thomas, through his relationship with Mrs. Rossman, became

aware of her habit of having large sums of money on her person or in her living quarters at all times. Motivated by a desire to obtain this money, Thomas entered into a conspiracy with one Gus DeMoss, a police officer in Tulsa, Oklahoma, one Frank Ellsworth and the appellant Wilson to rob Mrs. Rossman. In 1948, Thomas, then a Tulsa police officer, with DeMoss had arrested and testified against both Ellsworth and Wilson when they were charged with and convicted of 2nd degree burglary. In pursuance of the conspiracy, the Commonwealth contends, Ellsworth and Wilson went to Philadelphia and in the early evening of July 3, 1955 caused Mrs. Rossman's death by strangulation and took from her room a considerable amount of money.

The defense consisted of a complete denial of the existence of any conspiracy or that Wilson had any part in or knowledge of the robbery and death of Mrs. Rossman.

The proof of Wilson's complicity in the felony murder rested entirely upon circumstantial evidence together with statements alleged to have been made by Wilson to one Edward Nixon, for a short time Wilson's cellmate in a Las Vegas, Nevada, jail.

On June 26, 1955, Wilson, under the assumed name of "Ray Cox", and Ellsworth, under the assumed name of "Harry Stokey", met in Miami, Florida, with Thomas. While in Miami, Ellsworth,—for this purpose using the name "McGee",—telephoned DeMoss in Tulsa.[1] On

---

[1] Evidence to this effect came from the oral testimony of the clerk at the motel where Wilson and Ellsworth stayed in Miami, the hotel registration card which bore the license number of Wilson's automobile, the oral testimony of the lifeguard at the motel pool and of the salesman who sold Wilson the automobile, as well as records of the Peninsular Telephone Company of Tampa.

July 3, 1955 and several days prior thereto, Wilson and Ellsworth were in Philadelphia.[2]

On the evening of July 3, or the early morning of July 4, both Ellsworth and Wilson, under assumed names, flew to Miami and Atlanta, respectively.[3]

Before 1 p.m. on July 4, 1955 there were five telephone calls by Ellsworth and Thomas in Miami with DeMoss in Tulsa.[4] DeMoss then flew from Tulsa to

---

[2] Evidence to this effect came from the following sources: a bartender at the Torch Bar in Philadelphia identified Wilson as being in that bar on July 1, 1955; a dancer at a Philadelphia night club testified she talked with Wilson in the night club one night during the week prior to July 4, 1955; the Adelphia Hotel cashier identified Wilson as having been in the hotel lobby on the morning of July 2, 1955; a Biltmore Hotel employee saw Wilson in that hotel over the weekend prior to July 4, 1955; Helen White, an alleged prostitute, testified that she met and talked to Wilson on the afternoon of July 3, 1955 for approximately twenty to thirty minutes; a clerk in a drug store identified Ellsworth and Wilson as prospective customers who on July 2, 1955 inquired for 2 inch adhesive tape.

[3] Evidence in this respect came from the following sources: the records of Eastern Airlines indicated that a ticket was issued for flight 533 which left Washington at 11:37 p.m. July 3 for Atlanta, Ga. to a "Mr. Pritchard" (identified as Wilson) and a ticket was issued for flight 645 to a "Mr. Stokey" (identified as Ellsworth) which flight left Washington at 2:17 a.m. July 4 for Miami and a ticket was issued to Ellsworth for a flight from Miami to Tampa which arrived at Tampa at 3:45 p.m. July 4; one R. J. Such testified that he saw Ellsworth at the Washington Airport, conversed with him and was his fellow passenger on the flight to Miami.

[4] Telephone Company records indicated the following calls: (a) at 9:27 a.m. from Dade County Sheriff's office to Tulsa Police Department; (b) at 9:40 a.m. collect call from DeMoss to Thomas at the Dade County Sheriff's office; (c) at 9:51 a.m. an attempt by DeMoss to reach Ellsworth at the Columbus Hotel, Miami, where Ellsworth was registered as "Stokey" and a transfer and completion of this call to Thomas; (d) at 10:35 a.m. a call placed from a pay phone in the Columbus Hotel lobby to DeMoss' telephone number in Tulsa; (e) at 10:28 a.m. Thomas sent a $500 money order to

Tampa arriving there at 9:53 p.m. July 4.[5] Ellsworth flew from Miami to Tampa arriving there at 6:06 p.m. July 4.[6] Ellsworth, Wilson and DeMoss met at a Tampa nightclub on the evening of July 4.[7] At approximately eleven o'clock that evening DeMoss called Thomas in Miami[8] and then flew to Miami where he arrived at 12:44 a.m. July 5.[9] DeMoss and Thomas met in Miami,[10] after DeMoss had engaged a room and a safe deposit box in the Columbus Hotel.[11] On July 6 at 1:00 a.m. DeMoss returned by plane to Tulsa.[12]

On July 6, 1955 Wilson and Ellsworth, under assumed names, flew from Tampa to Tulsa.[13] On July 7, 1955 Ellsworth and Wilson were apprehended in Las Vegas not in connection with Mrs. Rossman's death but because they were in possession of large sums of money, principally in $100 bills. When Wilson was taken into custody he gave his correct name but denied that he had ever seen Ellsworth—who was then in custody of the police and in Wilson's presence.[14] Wilson had

---

DeMoss in Tulsa; (f) Ellsworth, using the name "F. J. McGee", made a collect call to DeMoss in Tulsa.

[5] Records of Braniff Airways and National Airlines.

[6] Records of National Airlines and Eastern Airlines.

[7] Testimony of two female employees of the nightclub.

[8] Records of Peninsular Telephone Company of Tampa.

[9] Records of Eastern Airlines.

[10] E. D. Rauls, in charge of the Criminal Division of the Dade County Sheriff's office, testified that Thomas introduced DeMoss to him in that office.

[11] The night manager of the Columbus Hotel testified to DeMoss being a guest in the hotel and produced hotel records which showed DeMoss' room registration and rental of a safe deposit box.

[12] Records of Eastern Airlines.

[13] Records of National Airlines and identification of Wilson as "Mr. Barnes" and Ellsworth as "Mr. McGee" by the National Airlines ticket agent who sold them the tickets.

[14] Testimony of R. H. Dunn, Detective Sergeant, Las Vegas Police Department.

on his person $9680, including 95 $100 bills and Ellsworth had $6700 in $100 bills. In Ellsworth's pocket was found a key to a room in the Dunes Hotel, Las Vegas, in which was found—stuffed in suitcases, shoes and a sock—$69,000, $66,200 of which was in $100 bills. The total amount found on the persons of Wilson and Ellsworth and in the Dunes Hotel room was $87,273.18.

The $100 bills and their serial numbers are very important and significant. On May 25, 1953 the Federal Reserve Bank of Philadelphia received from the Federal Reserve agent a series of $100 bills, the serial numbers of which began with the letter "C" and had the first five digits "00323", "C00323", and these bills were placed in circulation between May 25, and June 8, 1953. Palen Rossman, the victim's husband, on July 15, 1953 cashed a check at the Land Title & Trust Company, Philadelphia, in the amount of $27,055.54 and received $27,000 in $100 bills.[15] Mr. Rossman's journal indicated an entry concerning the cashing of this check and posting of that item under a heading in "Bryn Mawr Trust Company, Box 3 (1949)".[16] In the Bryn Mawr Trust Company was a joint safe deposit box in the names of Mr. and Mrs. Rossman, being Box B-1494. One of the appraisers of Mr. Rossman's estate testified to counting the cash in the various safe deposit boxes in the Bryn Mawr Trust Company and there was a total of $297,427, significantly the same amount left by Mr. Rossman at his death, most of this money being in $100 bills. Box B-1494 was closed by Mrs. Rossman two months prior to her death; on April 12, 1955 she had taken a safe deposit box in the Fidelity-Philadel-

---

[15] Testimony of Howard Derickson, teller at Land Title & Trust Co., who cashed the check; Henry Blizzard, head teller at same bank, who gave the $27,000 in $100 bills to Derickson for Rossman.

[16] Rossman's journal and testimony of Nathan McClure, a certified public accountant and business associate of Rossman.

phia Trust Company which she had access to 15 times within less than three months prior to her death. In the newly opened box in the Fidelity-Philadelphia Trust Company were the same series, type and denominations of bills placed by Mr. Rossman in the Bryn Mawr box and the same series, type and denomination of bills found in appellant's possession when arrested. The Commonwealth does *not* contend that in Wilson's and Ellsworth's possession nor in the safe deposit box of the victim were *only* $100 bills beginning with the serial number "C00323"; on the contrary $100 bills with entirely different serial numbers were found on Wilson, Ellsworth and in the safe deposit box. What the Commonwealth does contend is that it is very significant that so many bills of the same serial sequence were found on Wilson, Ellsworth, in the Dunes Hotel room, in the safe deposit box and in the purse of the victim, and further, that the lowest serial number of any of the "C00323" series was "C00323531A" and the highest number of the same series was "C00323800A" found on any person or in any place relevant to this case, the difference between the highest and lowest serial numbers being 270 $100 bills or the exact amount withdrawn by the victim's husband on July 21, 1953.

In the safe deposit box were found 10 $100 bills of the "C00323" series, the lowest number being "C00323537A" and the highest number being "C00323800A". In Mrs. Rossman's handbag was one $100 bill with the serial number "C00323599A". On Wilson's person were found 23 $100 bills of the "C00323" series; the lowest serial number was "C00323531A" and the highest serial number was "C00323790A". On Ellsworth's person were found three $100 bills of the "C00323" series; the lowest serial number was "C00323581A" and the highest serial number was "C00323789A". In the Dunes Hotel room

were found four $100 bills of the "C00323" series; the lowest serial number was "C00323548A" and the highest serial number was "C00323651A". Thomas spent three $100 bills bearing serial numbers "C00323743A", "C00323744A" and "C00323768A".

After the arrest of Wilson in Las Vegas he called Mrs. Ellsworth, the mother of F. J. Ellsworth, in Tampa on three occasions[17] and received from her a $400 money order.

The Commonwealth relied also on the testimony of Edward Nixon, Wilson's cellmate in Las Vegas. Nixon and Wilson for the first several days conversed generally, Wilson then told Nixon about the arrest of himself and Ellsworth in Las Vegas and the $86,000 which they had; that it was returned to them and that Ellsworth with the $86,000 went to Memphis but that he, Wilson, was unable to get away because the plane to Tampa was late. Wilson also discussed his various connections with police officials. According to Nixon, Wilson then tried to arrange for him, Nixon, to raise bail of $2500 so that he, Nixon, could go to Tampa and arrange for a man named Westmoreland and two girls to come to the extradition hearing and testify that Wilson was in Tampa on a certain night in July, 1955, the date of which Nixon was uncertain. Wilson, according to Nixon, stated that he and Ellsworth had gone to the "house" or "apartment" of a woman in Philadelphia to get her money and that "she had croaked".

On this appeal appellant assigns as erroneous the admission of certain evidence, certain portions of the court's charge and contends that taking the evidence as a whole it failed to establish appellant's guilt beyond a reasonable doubt.

Appellant's first contention is that the trial court erred in connection with the testimony of three wit-

---

[17] Records of Peninsular Telephone Company of Tampa.

nesses—Mrs. Walker, James Jerdon and Edwin Thomas—in two respects: first, in permitting their testimony to be admitted in evidence and, second, in the treatment of such testimony in the trial court's charge.

*Mrs. Walker* testified that she had arranged to drive Mrs. Rossman to Connecticut on Tuesday, July 5; that between 8:30-9:00 a.m. on July 3 Mrs. Rossman, "very excited and very upset", called her to cancel the Connecticut trip and said "Deputy Sheriff Thomas was up in an aeroplane going after Ridgeway . . . with two tommy guns"; in response to Mrs. Walker's questioning, Mrs. Rossman said "that they feared for her safety and they were going to move her to another downtown hotel . . . and they were sending a bonded chauffeur to move her to the hotel, and she wasn't to let anyone know where she was going, and she wasn't to leave her room that day." The appellant denies the admissibility of this testimony particularly since the telephone company records indicated that there had been no call that day between Mrs. Rossman and Deputy Sheriff Thomas, or anyone else, in Florida, until *after* Mrs. Rossman talked with Mrs. Walker.

*James Jerdon,* a Sansom Garage employee, on July 2, 1955 had driven Mrs. Rossman to Whiteville, North Carolina; on Sunday, July 3,—subsequent to Mrs. Rossman's conversation with Mrs. Walker, Jerdon received three calls from Mrs. Rossman in which she discussed a trip to Galax, Va. either on July 6 or July 7.

*Edwin Thomas* (not the deputy sheriff) was engaged by Mrs. Rossman to drive her to Orlando, Florida; they left on this trip on June 26 but in the vicinity of Washington Mrs. Rossman indicated that they were going to Miami; Thomas, finding it impossible for him to drive to Miami, turned back and returned Mrs. Rossman to Philadelphia; en route to Philadelphia Mrs. Rossman made tentative arrangements that he drive

her to Connecticut on June 28 or 29; in a telephone call on June 27 she was very definite about taking the trip but on June 28 she informed him that she had made other arrangements.

The admissibility of such testimony, if at all, must rest upon an exception to the hearsay rule. Mrs. Walker's testimony, if believed, was indicative of an intent on the part of Mrs. Rossman to stay in her room until a "bonded chauffeur" arrived and the fact is that she met her death in that room nine to ten hours later. Regardless of whether Mrs. Rossman was acting rationally or irrationally in arriving at this expressed intent and regardless of whether her story about a call from Thomas was real or fancied, nevertheless her statements to Mrs. Walker evidenced her then existing intention. The testimony of Jerdon and Thomas indicated that Mrs. Rossman was a very changeable person, unstable in her plans, and indicated her intent to take several trips before or after July 3.

The basis for the admissibility of any such testimony was well stated in *Cockcroft v. Metropolitan Life Insurance Company,* 133 Pa. Superior Ct. 598, 600, 601, 3 A. 2d 184: "The proposition has been accepted in this state, that extra-judicial declarations made by a person who cannot be called as a witness, and relied upon solely to show an existing intention or state of mind of the declarant, are admissible in evidence as an exception to the rule of hearsay, provided such declarations appear to have been made in a natural manner, not under circumstances of suspicion, and that they are material and relevant to the issue involved [citing cases]."[18]

---

[18] *Com. v. Marshall,* 287 Pa. 512, 520, 523, 135 A. 301; *Com. v. Palma,* 268 Pa. 434, 436, 438, 112 A. 26; *Ickes v. Ickes,* 237 Pa. 582, 590, 85 A. 885; *Goldsboro v. Loyal Protective Insurance Co.,* 93 Pa. Superior Ct. 583, 587, 588. In *Commonwealth v. Webster,* 5 Cushing

Mrs. Walker's testimony was clearly admissible. As the late Chief Justice VON MOSCHZISKER said in *Commonwealth v. Marshall*, 287 Pa. 512, 522, 523, 135 A. 301: "Intention, viewed as a state of mind, is a fact, and the commonest way for such a fact to evince itself is through spoken or written declarations. It is, therefore, because of the impossibility, in many cases, of proving intention apart from personal declarations, that they are admitted. The true basis of their admission, then, is necessity, because of which an exception to the hearsay rule is recognized, rather than that they are part of the res gestae: Ickes v. Ickes, 237 Pa. 582, 593, 594; Com. v. Trefethen, 157 Mass. 180, 31 N.E. 961; Mut. Life Ins. Co. v. Hillmon, 145 U. S. 285, 295; State v. Hayward, 62 Minn. 474, 65 N.W. 63, 70; Wigmore, supra, sections 1725, 1726. On this basis it is immaterial whether or not the declaration accompanied and was part of a relevant act: State v. Hayward, supra; Wigmore, supra. . . .

"We do not mean to say that evidence of the kind here in question is admissible under all circumstances. Ordinarily, it should not stand alone; it ought to be accompanied by other, not inconsistent, evidence, and to the trial judge must be left the discretion of rejecting it in proper cases: see Com. v. Trefethen, supra, at p. 184; Wigmore, supra. Under the circumstances of the present case, no error was committed by admitting the testimony here in controversy."

While the admissibility of Jerdon's and Thomas' testimony is not as clear since its relevancy and materiality may be doubtful, yet, even if the admission of such testimony was error, it was certainly harmless error. The only effect of their testimony was to depict

295 (Mass.) the court allowed the Commonwealth to show that Dr. Parkman, the deceased, had been inquiring along the street for the office of Professor Webster.

Mrs. Rossman as an eccentric person whose mind was in a state of change and undependability and such testimony could not possibly have prejudiced the appellant in any manner.

The admission of Mrs. Walker's testimony did not determine the credibility of the statements of Mrs. Rossman. Whether Mrs. Rossman was or was not acting upon a message from Deputy Sheriff Thomas, whether she had in fact talked to him prior to the time she talked to Mrs. Walker, and whether the story which she told was real or fancied, were questions for the determination of the jury.

A consideration of the charge of the court on this subject reveals no error. The court left to the jury the determination whether Mrs. Rossman's declarations to Mrs. Walker were "imaginary, flighty and without basis in fact." In commenting on the attack by the defense on Mrs. Rossman's statement concerning a "bonded chauffeur" the court said: "I am not saying it cannot be a subject of ridicule. It all depends on your viewpoint. The fact of the matter is that she remained in that hotel, for all we know, until the period of time between five and seven o'clock that evening when she was robbed and killed." The credibility and the weight to be attached to Mrs. Rossman's alleged statements were properly left to the jury's determination by the trial court in a fair and impartial manner.

Appellant next urges that the trial judge erred in permitting the Commonwealth to show in rebuttal certain prior statements of the Commonwealth's witness Edward Nixon and in the treatment of such testimony by the court in its charge.

An examination of the record indicates that the testimony of Nixon, the possessor of a very bad criminal record, was in many instances inconsistent, contradictory and somewhat in conflict with established

facts. Nixon was subjected to a rigorous and searching cross-examination during the course of which he admitted a number of criminal offenses in Pennsylvania, that he had been incarcerated in the Northampton County Prison and had escaped therefrom, that he had been arrested for the theft of an automobile in the State of Wyoming and that he had escaped while being returned to Pennsylvania. The defense called seven witnesses who testified, in effect, that they knew Nixon and that his reputation for truth and veracity was very bad. The defense very properly made every effort to discredit the testimony of this ex-convict.

The Commonwealth in rebuttal offered the testimony of three witnesses: FBI Agent Dickman, FBI Agent Applegate and Deputy U. S. Marshall Sampson. Agent Dickman testified that in Las Vegas, between August 1 and August 6, 1955, on six different occasions he interviewed Nixon and he testified to the contents of such interviews: as appellant's brief admits "the statements attributed to Nixon [by this agent] were all very consistent with the story that he told on the stand." Agent Applegate interviewed Nixon on October 25, 1955 in the Georgia State Prison, and he testified that Nixon had told him a story which approximated his trial testimony. Marshall Sampson testified that Nixon told him that the appellant had offered to procure a bond for Nixon to secure Nixon's release.

The defense attacks the testimony of the three witnesses in two respects: first, that their testimony was not admissible under the consonant statement rule and, second, that the trial court did not properly evaluate or instruct the jury in respect to Nixon's testimony.

As a general rule a statement made by a witness at one time, while admissible to contradict him, is not competent to corroborate or substantiate his present testimony. Were it not otherwise, the door might be

opened to the fabrication of evidence. However, there are certain well-recognized exceptions to this general rule: prior declarations of a witness, which are consistent with his present testimony, may be admissible to corroborate his present testimony if it be alleged that the witness' present testimony is recently fabricated, or if it be claimed that the witness is testifying from corrupt motives.[19]

Evidence of consonant statements, if admissible, are admissible only in rebuttal and then only for the purpose of showing that that which the witness now testifies to has not been recently fabricated and not for the purpose of proving the truth of the present testimony. See: *Ribson v. Cottom*, 387 Pa. 155, 127 A. 2d 101. *Howser v. Commonwealth*, 51 Pa. 332 is somewhat apposite to the instant situation. A witness McCleary, an ex-convict, testified for the Commonwealth. The court permitted him to be recalled to testify what occurred when certain persons visited him in his cell, that he showed them how communications between adjoining cells could be made and that no promise or inducement had been held out to him to testify. There was objection that this tended to corroborate him when no attempt had been made to impeach him. This Court said (p. 340): "Though not formally impeached, this witness, as a pardoned convict, testified necessarily under circumstances that tended strongly to discredit him. The jury would inevitably regard his testimony with suspicion. It was very proper, therefore, to corroborate him, and surely if he could demonstrate to his visitors that communication between cells was possible, he had a right to prove the fact in corroboration of his statement that such communications had actually taken place. And he was entitled also to the fact

---

[19] Henry, Pennsylvania Evidence (4th ed.), Volume 1, §12, pp. 24 et seq. and cases therein cited.

that no inducement had been held out to him to testify against the defendants."

In the instant case Nixon, a convict, with a long criminal record, presently serving in the Georgia State Prison, was not only attacked as to his credibility but as to whether or not an inducement had been held out to him to testify in the hope that he would secure favorable treatment at the hands of the Pennsylvania authorities in regard to his Pennsylvania parole violation. Under the instant circumstances the trial court very properly permitted the testimony of these three rebuttal witnesses not to prove that that which Nixon testified on the stand was true but that it was not of recent fabrication and that no inducement had been held out to him to so testify.[20]

A reading of the trial court's charge in this respect indicates that it was free of error. The trial judge stated: *"If the guilt or innocence of this defendant were to be determined alone upon the uncorroborated testimony of Edward C. Nixon I should be directing you to return a verdict of not guilty."* It is hard to envisage a more fair, outspoken and favorable comment for the defense than this expression of the trial judge's opinion concerning Nixon's testimony. Furthermore, the trial court told the jury that Nixon was a "convicted felon, presently serving a sentence in a Georgia Prison," that the examination "has brought out a number of offenses for which he was convicted and the number of escapes from prisons and penitentiaries. All in all, it is the story of one whose life has been badly misspent." Nixon's testimony was characterized by the

---

[20] The fact is that there was inherent corroboration of Nixon's testimony to the effect that Wilson was attempting to secure for Nixon release on bail because it is established as a fact that Wilson did secure from Mrs. Ellsworth a money order for $400 while he and Nixon were fellow inmates in the Las Vegas jail.

trial judge as "tainted, corrupt and entitled to little weight" and the jury was warned to scrutinize such testimony "with the greatest care." The trial judge very properly allowed the jury to determine whether Nixon's testimony was supported by any other evidence that would give it the imprint of truth and stated ". . . that the acceptance by the jury of Nixon's testimony would depend on what corroborative evidence the jury might find." We are of the opinion that the trial judge committed no error but was exceedingly fair to the appellant in his instructions to the jury in this respect.

Appellant next complains that the trial judge should not have admitted into evidence testimony showing the concatenation of the serial numbers of bills found in the possession of appellant and Ellsworth in Las Vegas (four days after the murder) with the number of bills of the same series found in Mrs. Rossman's safe deposit box and in admitting testimony which inferentially showed that currency to the total amount of the series embraced within the highest and lowest numbers of the $100 bills located had been received by Mrs. Rossman's husband in July 1953 and placed by him in a safe deposit box.

The Commonwealth established by competent testimony that bills of the denominations of $100 which bore serial numbers beginning "C00323" were not issued until May 25, 1953, at which time the Federal Reserve Bank of Philadelphia received such currency from the Federal Reserve Agent. Within five weeks Palen Rossman, the victim's husband, secured from the Land Title Bank & Trust Company 270 bills of the denomination of $100. There was testimony from which the jury might have found that such currency was placed in a safe deposit box in the Bryn Mawr Trust Company in the joint names of Mr. and Mrs. Rossman.

Subsequent to the robbery and homicide certain $100 bills of the series "C00323" were found in appellant's possession, in Ellsworth's possession and in the Las Vegas hotel room of appellant and Ellsworth. One such bill was found in Mrs. Rossman's purse, three such bills were circulated by Deputy Sheriff Thomas and other bills were found in Mrs. Rossman's safe deposit box in the Fidelity-Philadelphia Trust Company. Significantly the numerical difference between the lowest serial number of any of the $100 bills of series "C00323" found after the homicide and the highest serial number of any such bills equalled 270, the exact number of bills which had been secured by Mrs. Rossman's husband on July 15, 1953. The admissibility of such testimony is beyond question. The testimony was not only strong but highly indicative of appellant's complicity in the robbery and death of Mrs. Rossman, and the jury could well have been justified in finding that the bills found in appellant's possession, in Ellsworth's possession and in the Las Vegas hotel room came into their possession through the robbery which took place on July 3, 1955. The possession of currency by one person shown to have been in the possession of the victim of a robbery is evidence that such person was a party to the robbery: *Com. v. Fusci,* 153 Pa. Superior Ct. 617, 35 A. 2d 93. Cf: *Com. v. Bassi,* 284 Pa. 81, 130 A. 311; *Com. v. Pezzi,* 284 Pa. 85, 130 A. 312.

The trial judge in treating the problem of this currency in his charge did so fairly, accurately and in a manner fair both to the appellant as well as the Commonwealth. Appellant's contention in this respect is utterly without merit.

Appellant now contends that the trial court erred in admitting evidence of numerous 'phone calls, trips and conversations among other persons, including alleged co-conspirators, in the appellant's absence, ques-

tions whether the evidence of a conspiracy was sufficient to render such evidence admissible and urges that the trial court erred in its charge on this subject.

The Commonwealth urges that even though the specific conspiracy between Thomas, DeMoss, Ellsworth and appellant was to rob Mrs. Rossman and that during the commission of this robbery the murder occurred, yet that specific conspiracy was but an integral part of a broader conspiracy which included disposition of the proceeds of the robbery, concealment of the crime and fabrication of evidence as a defense and that such concealment proved unsuccessful. The declarations or acts of one conspirator made to third parties in the absence of his co-conspirator are admissible in evidence against both provided that such declarations were made during the conspiracy and in furtherance of the common design: *Com. v. Spardute,* 278 Pa. 37, 49, 122 A. 161; *Com. v. Biddle,* 200 Pa. 640, 645, 50 A. 262; *Heine v. Com.,* 91 Pa. 145, 148; *Com. v. Jermyn,* 101 Pa. Superior Ct. 455, 471.

An examination of the record indicates that the Commonwealth produced sufficient evidence from which the jury were justified in finding the existence of a conspiracy; acts and declarations of the co-conspirators, even in the absence of appellant, were admissible, and testimony as to the actions of the co-conspirators, even after the robbery and homicide had taken place, was properly admitted in evidence. Neither in the admission of evidence in this respect nor in the court's instructions to the jury on this subject can we find error on the part of the trial court.

The Commonwealth produced testimony that Ellsworth and appellant in 1948 had been convicted in Payne County, Oklahoma, of second degree burglary, the entry of an unoccupied building, and that they were sentenced to two years imprisonment. Appellant

contends that evidence of appellant's prior conviction should not have been admitted in evidence, particularly in the absence of proof that appellant was a confirmed criminal. In *Commonwealth v. Thompson*, 389 Pa. 382, 399, 133 A. 2d 207, we reiterated the well-established and recognized Pennsylvania rule that evidence of prior offenses committed by the defendant is admissible in a homicide trial not for the purpose of enabling the jury to consider such evidence in determining the defendant's guilt or innocence but *solely* for the purpose of enabling the jury, *after* a defendant has been found guilty of murder in the first degree, to decide what penalty should be imposed upon the defendant. In *Commonwealth v. Cannon*, 386 Pa. 62, 123 A. 2d 675, we expressly rejected appellant's present contention that the admissibility of prior convictions should be limited to cases where the defendant was a professional criminal. Appellant's conviction of second degree burglary was properly admitted to enable the jury, *after* it had determined appellant's guilt of murder in the first degree, to fix the appropriate penalty.

Lastly, appellant complains that the Commonwealth's case is based upon conjecture and surmise and that the trial court's charge emphasized the Commonwealth's case and belittled appellant's case. Pursuant to our duty, we have carefully examined not only the entire record but the trial court's charge. We have been impressed, upon reading the record, by the fact that so much of the Commonwealth's case rests upon, facts established not through the medium of oral testimony but records and documents such as airline records, telephone company records, bank records, etc., and not upon conjecture and surmise. The Commonwealth's case is in large measure based upon documentary evidence prepared by business concerns in the course of their business and not with any idea of crime

detection. Through the medium of this documentary evidence the Commonwealth has presented a case, even though based upon circumstantial evidence, which unerringly points to the complicity of appellant in the robbery and ensuing death of Mrs. Rossman. An examination of the record clearly indicates the heights to which modern methods of crime detection can rise. Our research reveals no case in which the circumstances speak so eloquently in pointing the finger of guilt at a defendant. The trial court's charge neither emphasized the Commonwealth's case nor belittled the appellant's case. On the contrary, the trial court fairly, logically and in accordance with the highest judicial standards, instructed the jury upon the applicable law, reviewed carefully the testimony, and fairly placed the determination of appellant's guilt or innocence in the hands of the jury.

Our review of the record convinces us that the appellant had a fair and impartial trial, that all his rights were zealously protected and that the Commonwealth's evidence, though circumstantial in nature, proved beyond a reasonable doubt appellant's guilt.

Judgment and sentence affirmed.