392 A.2d 1274

COMMONWEALTH of Pennsylvania

v.

Walter LOWENBERG, Appellant.

Supreme Court of Pennsylvania.

Argued March 9, 1978.

Decided Oct. 5, 1978.

Reargument Denied Nov. 8, 1978.

Richard H. Martin, Baskin, Boreman, Wilner, Sachs, Gondelman & Craig, Pittsburgh, for appellant.

Robert E. Colville, Dist. Atty., Robert L. Eberhardt, Asst. Dist. Atty., Charles W. Johns, Pittsburgh, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

NIX, Justice.

On March 10, 1976, appellant was convicted of murder of the third degree. This is a direct appeal from the judgment of sentence of 10 to 20 years imposed thereunder.[1]

The testimony established that on March 14, 1975, Nevada Bellman, an 82 year-old woman, was found beaten to death in the bathtub in her apartment in the City of Pittsburgh. Police investigation determined that there had been no forced entry. This led them to suspect that someone who was known to the victim was the killer, and also to suspect that it might have been someone residing in the apartment

1. Our jurisdiction in this case is based on the Appellate Court Jurisdiction Act of July 31, 1970, P.L. 673, No. 223, art. II, § 202(1), 17 P.S. § 211.202(1) (Supp.1978–79).

house. The police, therefore, questioned the residents of the building. On March 16, 1975, appellant, a 15 year-old boy who lived in the building, was questioned by Detectives Freeman and Gorny when he arrived home after having spent several days at The Meadows, a harness racing track in Washington County. Appellant's mother and brother were present during this questioning. Appellant made no incriminating statements, but acknowledged that he knew the victim and that he had run errands for her in the past. The detectives observed at this time that appellant had scratches on his nose, bruises on his arm and an injury to his thumb.

Shortly thereafter, it was learned that appellant had been seen speaking to Miss Bellman on the night prior to her body being found and it was also learned that appellant had not attended school on the day of the killing. As a result of this information Detective Freeman and another detective returned to the Lowenberg apartment. Appellant was there alone and upon entry into the apartment the officers explained to him that he was suspected of killing Nevada Bellman. He was then advised of his Constitutional Rights, informed that he could have any adult present that he wished while he was being questioned, and then asked if he understood the nature of the offense which was the subject of the investigation. Appellant replied in the affirmative and said he would rather talk to them alone. He then related that he and the deceased had a dispute about an $82.00 check and she called him a thief and threatened to call his mother and the police. When she went to the telephone he struck her with his fist, and she fell to the floor groaning. Appellant then stated that he dragged her into the bathroom, placed her in the tub and struck her about twenty times with a pipe. He said that the pipe was laying in the bathroom and he picked it up. After making this statement, appellant was taken to the Public Safety Building and turned over to Detectives McKay and Stotlemeyer.

Detective Robert W. McKay testified that he took appellant into Interview Room No. 222 for the purpose of making

up the arrest papers. At that time, appellant began talking about what had occurred on the day of the murder and related essentially the same version he had given to Detective Freeman earlier. After this first statement to Detective McKay, appellant made a second statement to Detective McKay.

On March 24, 1975, a Coroner's Inquest was held. The Coroner held that a *prima facie* case of Murder had been established against appellant and ordered him recommitted to Juvenile Hall. Following the inquest, appellant met with his attorney who cautioned him not to discuss the case with the police.

Appellant was returned to the Public Safety Building where he was fingerprinted and photographed. He was then transferred to the Shuman Center by Detectives Freeman and Gorny. During the trip appellant requested an ice cream cone and the detectives complied by stopping at Islay's, a dairy store on the way. While inside the store during a casual conversation about The Meadows, appellant again volunteered his confession:

Q. (Assistant District Attorney Fagan) Any conversation take place at that time as far as the accused here is concerned?

A. (Detective Gorny) Yes, sir. The accused and I were discussing the racetrack such as any of the drivers.

Q. Why? Are you interested in the racetrack?

A. Occasionally.

Q. Are you familiar with the Meadows?

A. Too familiar.

Q. Did you find the accused here knowledgeable about the track?

A. Yes, sir, he was.

Q. What did he have to say along that line?

A. He stated that he aspired to be a sulky driver, and as I said, he mentioned that he knew quite a few of the drivers, that he helped out around the stable and so forth.

Q. Anything else?

A. Yes, then he asked us if we found a pipe.

Q. If you found the pipe?

A. Yes, sir.

Q. When he made that statement, what did you say?

MR. MARTIN: Your Honor, I would object to all of this testimony on the grounds previously stated.

THE COURT: Objection overruled.

Q. When he said that, what did you say?

A. I cautioned him that his attorney had advised him not to discuss the case or anything that happened during the case while he was in our custody.

Q. Did that have any effect on him?

A. Momentarily it did. He referred to his attorney as his family having to go out and get some money together to pay for his attorney.

Q. And?

A. And then, after a period of silence, he said, "I'm in some bad trouble," or words to that effect. It sounded to me like he said, "I'm in some bad trouble." He said, "If only I would have hit her when she—she threatened to call my mother and tell her about the check, and also the police." He says, "If I would have hit her, I would have been in trouble, but when I put her in the tub, I'm in a little more trouble than I would have been."

Q. Did it go any further than that?

A. No. At this time we left Islay's and got in the car and proceeded out to Shuman Center where again a few words of conversation were about the track and a uniform that he had already purchased, sulky driver's uniform, so forth.

At trial, evidence was produced which showed an $80.00 discrepancy between the dollar amount of a check payable to appellant and the corresponding deduction noted in Miss Bellman's ledger. Barbara Connor, a bookkeeper at Miss Bellman's bank, testified that on March 12, 1975, Miss Bell-

man had called her about that check. Mrs. Connor told her the check was for $82.00. As a result of this call, the check was not honored by the bank.

Herbert Schwachter, appellant's uncle, testified that he had endorsed the check at the request of appellant.

Cooper Terry, custodian of the apartment building where Miss Bellman lived, testified that Miss Bellman had told him she wanted to see appellant on a matter, ". . . far worse than borrowing money." the Wednesday before her death. Mr. Terry also placed appellant in the building the day Miss Bellman died. A fingerprint obtained from the top portion of the head of the shower in Miss Bellman's bathroom matched an exemplar taken from the appellant following the inquest on March 24, 1975.

Prior to trial appellant made a pre-trial application to suppress the above oral admissions. After a hearing, the court suppressed the oral admissions made by appellant at his home and at the Public Safety Building on March 18, 1975. The admission made to Detectives Freeman and Gorny on March 24, 1975, inside Islay's Dairy Store was not suppressed.

Appellant argues that the court below erred a) in admitting into evidence the confession made by appellant on March 24, 1975, while at the dairy store; b) in admitting into evidence the fingerprint exemplars taken while appellant was in custody; and c) in permitting the introduction of the statement of the deceased relating to Miss Bellman wanting to see appellant on a financial matter, ". . . far worse than borrowing money."

██ In support of the position that the statement of March 24, 1975 was not properly admitted appellant has two strings to his bow. He argues that the statement was elicited without proper *Miranda* warnings [2] and in violation of our rules relating to confessions by juveniles. *See Commonwealth v. Smith,* 472 Pa. 492, 372 A.2d 797 (1977);

2.  *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

*Commonwealth v. McCutchen,* 463 Pa. 90, 343 A.2d 669 (1975). Both of these arguments must fail for the same reason. These principles were designed to protect the rights of an accused during police interrogation. In this case, the trial court found, and the record adequately supports the conclusion, that the March 24th statement was not the product of interrogation, but was, instead, a volunteered remark. *Miranda v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), (volunteered statements of any kind are not barred by the Fifth Amendment). The evidence supports a finding that the police were engaged in social conversation when appellant raised the topic of the crime with which he was charged. When he broached that subject he was immediately reminded that his attorney had advised him not to discuss the matter. *Cf. Commonwealth v. Simala,* 434 Pa. 219, 252 A.2d 575 (1969) (where we held that the police conduct was designed to elicit a confession and thus constituted "interrogation"). Ignoring the admonition and without encouragement of any kind the appellant made the statement in question. Thus there was ample justification to find that there was no interrogation and that the statement was properly admitted as a volunteered utterance. *Commonwealth v. Yount,* 455 Pa. 303, 314 A.2d 242 (1974).

We must also reject the suggestion that *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) is controlling in this case. That decision is clearly distinguishable since its holding was based upon a determination that the police had intentionally engaged in conduct designed to elicit the challenged statement. As we have indicated such was not the case here.

■ Appellant also seeks to attack the March 24th statement on the grounds that it was allegedly the product of an unlawful arrest and that it was tainted by the illegality of the March 18th interrogation. An arrest is lawful if based upon probable cause to believe that a crime had been committed and that the person arrested was the probable perpetrator. *Commonwealth v. Jones,* 457 Pa. 423, 322 A.2d 119

(1974). In dealing with probable cause we deal with probabilities—the factual and practical consideration of every day life. *Commonwealth v. Jones, supra.* Here the officers were aware that appellant was not in school at the time when the crime was committed, that appellant was known to Miss Bellman, that she wanted to see him, and that the person who had committed the murder was known to Miss Bellman because he or she had been admitted to the apartment.[3] Most important, appellant had injuries to his nose, arm and thumb, all of which were consistent with an assault of this type. Finally, appellant had left home for several days after the killing. These facts were sufficient to support the court's conclusion that there was probable cause to arrest. We therefore reject appellant's claim that the arrest was illegal and tainted the March 24th statement.

The trial court found that the March 16th statements should be suppressed because the Commonwealth had not proven an effective waiver of Fifth and Sixth Amendment rights by this minor. *Commonwealth v. Smith, supra; Commonwealth v. McCutchen, supra.* However, the suppression of the March 18th statements do not require the suppression of the statement of March 24th. The record adequately supports the conclusion that the March 24th statement was not an exploitation of the initial illegality, but was obtained by means sufficiently distinguishable to be purged of any taint. *See Wong Sun v. U. S.,* 371 U.S. 471, 487, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

**3.** The victim's nephew testified that Miss Bellman was security conscious and that not only was the apartment building protected by security doors requiring a key for admission but that his aunt had a chain lock that was kept bolted until she identified her visitor. This information relating to Miss Bellman's caution in admitting persons to her apartment was ascertained by the officers early in the investigation.

In this aspect the instant case is similar to *Commonwealth v. Gullett,* 459 Pa. 431, 329 A.2d 513 (1974). In *Gullett* the evidence established that the defendant was known to the victim and thus someone she would have admitted on the premises. We also found it significant in finding probable cause in *Gullett,* that the defendant in that case was also not at home at the time of the crime. *Commonwealth v. Gullett, supra.*

█ In order to be purged of the taint of a prior illegality, the Commonwealth has the burden of proving that the confession results from an intervening act of free will which is free of any element of coerciveness due to the prior illegality. *Commonwealth v. Farley,* 468 Pa. 487, 364 A.2d 299 (1976). *See also Commonwealth v. Cunningham,* 471 Pa. 577, 370 A.2d 1172 (1977); *Commonwealth v. Cockfield,* 465 Pa. 415, 350 A.2d 833 (1976). In both *Cunningham* and *Cockfield* statements were taken from the defendants as a result of interrogation, but in the presence of counsel, and we held that the presence of counsel dissipated any taint of the unlawful conduct. In the present case, the statement was not made in the presence of counsel, but it was made six days after the arrest and initial interrogation, and was not the result of interrogation. There had been an arraignment and a coroner's inquest. In addition, appellant had met with his mother and with counsel. Counsel had explained his rights to him and had advised him not to speak with the police about the crime. When appellant began to discuss the subject he was cautioned to remember the advice his counsel had given him. In this circumstance it seems clear that any taint of the original illegality was dissipated and that appellant's conduct was not the product of unlawful police conduct, but was, instead, the product of appellant's free will and desire to talk about a crime which he had committed.

█ A fingerprint exemplar, removed from appellant while he was in custody matched a fingerprint taken from the showerhead in the bathroom of the victim's apartment. Appellant relying upon his position that his arrest was illegal argues that the fingerprint exemplars taken from him should have been suppressed. *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). Since we have determined that appellant's arrest was lawful the pillar supporting this argument is withdrawn and it must necessarily fall.

█ Appellant also challenges the introduction of the deceased's statement to the effect that she wanted to see appellant on a financial matter, ". . . far worse than

borrowing money." It is argued that this evidence was inadmissible hearsay and that appellant's timely objection to its admission should have been sustained. The trial court overruled the objection and admitted the testimony on the theory that it fell within the state of mind exception to the hearsay rule. We agree.

This testimony was offered to establish the intention of the deceased to see the appellant and confront him concerning a financial matter she considered serious. In discussing the declarations of a deceased victim to establish the declarant's existing intention at a time of particular relevance in the sequence of events we have stated:

"It must be recognized, however, that some confusion is present in the authorities as to the circumstances under which declarations of the character we are now discussing may be admitted to show intention. The question is frequently dealt with as one of res gestae (see *Com. v. Palma,* 268 Pa. 434, 112 A. 26; *Hunter v. State,* 40 N.J.L. 495, 536; *State v. Hayward,* 62 Minn. 474, 65 N.W. 63, 65; 3 Wigmore, Evidence, section 1726), but such evidence is more correctly supportable on another basis. In many of the decided cases treatment of the problem as one of res gestae did not affect the result reached, since the elements of res gestae were present, as, for instance, in the three cases just cited; but, in other instances, such treatment might result in the exclusion of admissible evidence. See Wigmore, supra, section 1726.

Intention, viewed as a state of mind, is a fact, and the commonest way for such a fact to evince itself is through spoken or written declarations. It is therefore because of the impossibility, in many cases, of proving intention apart from personal declarations, that they are admitted. The true basis of their admission, then, is necessity, because of which an exception to the hearsay rule is recognized, rather than that they are part of the res gestae. *Ickes v. Ickes,* 237 Pa. 582, 593, 594, 85 A. 885; *Com. v. Trefethen,* 157 Mass. 180, 31 N.E. 961; *Mut. Life Ins. Co. v. Hillmon,* 145 U.S. 285, 295, 12 S.Ct. 909, 36 L.Ed. 706; *State v.*

*Hayward,* 62 Minn. 474, 65 N.W. 63, 70; Wigmore, supra, sections 1725, 1726. On this basis it is immaterial whether or not the declaration accompanied and was part of a relevant act. *State v. Hayward, supra;* Wigmore, supra. *Commonwealth v. Marshall,* 287 Pa. 512, 521–22, 135 A. 301, 305 (1926).

*See also Commonwealth v. Ilgenfritz,* 466 Pa. 345, 353 A.2d 387 (1976); *Commonwealth v. Wright,* 455 Pa. 480, 317 A.2d 271 (1974).

In addition to the necessity for such an exception, the admission of this type of evidence is justified because the circumstances in which these utterances were made indicate that they accurately reflected the declarant's state of mind at that time and there was an absence of a motive to deceive. *Commonwealth v. Thomas,* 410 Pa. 160, 189 A.2d 255 (1963), *cert. denied,* 375 U.S. 856, 84 S.Ct. 118, 11 L.Ed.2d 83 (1963) (should be accepted because the declarations were made in a "natural manner"). We find that this testimony was properly within the state of mind exception and the court was correct in admitting it.

Judgment of sentence affirmed.

MANDERINO, J., filed a dissenting opinion in which ROBERTS, J., joined.

MANDERINO, Justice, dissenting.

I dissent. Our rules regarding juvenile confessions were designed to protect the youthful accused from the added pressures that youth might cause during police interrogation, (i. e. to assure that any confession given was voluntary), *and* to assure that a juvenile's lack of intellectual and emotional maturity would not cause an unknowing or unintelligent waiver of constitutional rights.

In the instant case, appellant chose to waive his constitutional right to remain silent when he began speaking to police detectives at Isaly's on March 24th. In the absence of adult guidance, that purported waiver cannot be said to have been knowing and intelligent.

Additionally, when appellant spoke to police on March 24th, he did so in the belief that his statement of March 15th could be used against him. One in that position does not know that he is saying something new. The statement should therefore be suppressed.

ROBERTS, J., joins in this dissent.