434 A.2d 707

**COMMONWEALTH of Pennsylvania**

**v.**

**Lynn GLASS a/k/a Lynn Haberland, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 2, 1980.

Decided Aug. 31, 1981.

Application for Reargument Denied Dec. 17, 1981.

Anthony W. DeBernardo, Jr., Richard H. Galloway & Associates, P. C., Greensburg, for appellant.

James J. Conte, Asst. Dist. Atty., Greensburg, for appellee.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## ORDER

PER CURIAM:

The Court being equally divided, the judgment of sentence is affirmed.

O'BRIEN, C. J., filed an Opinion in Support of Affirmance in which LARSEN and KAUFFMAN, JJ., join.

ROBERTS, J., filed an Opinion in Support of Reversal.

FLAHERTY, J., filed an Opinion in Support of Reversal in which NIX, J., joins.

## OPINION IN SUPPORT OF AFFIRMANCE

O'BRIEN, Chief Justice.

This is an appeal from an Order imposing judgment of sentence entered on May 27, 1980, in the Court of Common Pleas of Westmoreland County. On September 18, 1979, appellant, Lynn Glass, also known as Lynn Haberland, was convicted by a jury of voluntary manslaughter. Post-verdict motions were filed, argued, and denied. On May 27, 1980, appellant was sentenced to undergo a term of imprisonment of not less than five years nor more than ten. This appeal followed.

It is undisputed that the instant killing arose out of a domestic dispute between appellant and David P. Haberland, a man with whom appellant had been living in either a common-law marriage, as she contended, or a meretricious relationship, as the Commonwealth asserted.

In the evening of November 24, 1979, appellant and David Haberland had been drinking, first at one and later at a second North Huntingdon, Pennsylvania, tavern. From this latter tavern they departed for their home, appellant in her own automobile and, approximately one-half hour later, David Haberland in his.

Early in the morning of November 25, 1979, police and emergency personnel were summoned by appellant to the address she shared with David Haberland. There the officers found the body of David Haberland lying on his back on the kitchen floor. Post-mortem examination determined that the cause of death was attributable to gunshot wounds of the head and chest. The murder weapon, a .38 caliber revolver, was discovered under the right side and right hand of the body.

At trial the Commonwealth sought to prove appellant shot the victim intentionally because she believed he was going to leave her. The defense, on the other hand, contended the weapon discharged accidentally during a struggle precipitated by the decedent. The jury found appellant guilty of voluntary manslaughter. Appellant now advances nine issues for our review.

First appellant asserts the trial court erred in permitting two Commonwealth witnesses, Timothy Walker and Joyce Haberland, to testify over defense objection. The witness Walker was an employee of the victim at his sign painting company; the witness Haberland was the decedent's former wife. Both testified at trial concerning statements made to them by the victim, the sense of which was that he was dissatisfied with his relationship with appellant and intended to terminate it. Appellant complains the statements were irrelevant and hearsay.

Clearly the testimony, offered as it was to establish motive, was relevant; indeed appellant concedes that fact. (Brief for appellant at 11). I conclude that it was also admissible under the state of mind exception to the hearsay rule. The statements admitted in the instant case are indistinguishable from the statement which we held to be admissible in *Commonwealth v. Lowenberg*, 481 Pa. 244, 392 A.2d 1274 (1978). *Lowenberg* reaffirmed the well-settled principle that the out-of-court statements of the victim which show the declarant's state of mind are admissible. State of mind in the instant case is relevant in that it is probative of motive. There was no error in admitting the complained-of testimony.

Second appellant contends the trial court erred in denying a motion for mistrial made during the testimony of the witness Joyce Haberland. During her direct examination the witness testified:

"He [the decedent] said he just about had all he could take. He just couldn't stand the quarrelling and the jealousy and the arguments and the police coming to the house, break it up, and he just couldn't live that way any longer and he was going to leave for good this time."

Following this testimony the defense moved for mistrial. The motion was denied and appellant now assigns that ruling as error. The gravamen of appellant's complaint is that testimony from which a jury may reasonably infer prior criminal conduct on the part of an accused constitutes prejudicial error.

The principle of law upon which appellant relies is undoubtedly correct; it is her application of the principle to the facts of the instant case which is erroneous. First, the import of the statement is capable of question. That the police came to the home of the victim need not imply criminal conduct on the part of anyone. Such testimony may lead a jury to infer criminal conduct on the part of the decedent. "To warrant a characterization as prejudicial the testimony must convey to the jury, either expressly or by reasonable implication, the fact of a prior criminal offense."

*Commonwealth v. Irwin,* 475 Pa. 616, 622, 381 A.2d 444, 449 (1977), quoting *Commonwealth v. Banks,* 454 Pa. 401, 411, 311 A.2d 576, 581 (1973). Second, even if the testimony complained of would necessarily have led the jury to infer prior criminality on the part of appellant, that fact is not dispositive of the question. For the rule that the prosecution may not introduce evidence of the accused's prior criminal conduct as substantive evidence of his guilt of the charge being tried is not without exception. *Commonwealth v. Stanley,* 484 Pa. 2, 398 A.2d 631 (1979). Among the exceptions is that which permits the introduction of such evidence to show the absence of mistake or accident. McCormick, Evidence, § 190 at 448–451 (Cleary ed. 1972); see, also *Commonwealth v. Lasch,* 464 Pa. 573, 347 A.2d 690 (1975) (Opinion in support of affirmance). Appellant's defense at trial was that the instant killing was accidental. Even if the testimony at issue permitted the jury to infer prior criminality, its admission was not prejudicial error in that it falls within the exception which allows the prosecution to introduce such evidence to prove motive, intent, absence of mistake or accident.

Appellant's third assignment of error assails a ruling of the trial court concerning the testimony of a defense expert. At trial the Commonwealth produced as its expert Mr. Harry Fox, a Pennsylvania State Police criminalist. Mr. Fox testified that he had conducted an analysis of the hands of the decedent to ascertain the likelihood the victim had recently fired a handgun. Mr. Fox testified at length concerning the details of his analysis and the results thereof. Based upon the standards utilized by the Pennsylvania State Police, Mr. Fox formulated an opinion that the decedent had not recently discharged a firearm.

The defense called as its expert Dr. Vincent P. Guinn, a professor of chemistry at the University of California and a recognized authority on the detection of gunshot residue. Dr. Guinn, too, testified at length concerning the testing for gunshot residue. Using the data obtained by Mr. Fox, Dr. Guinn testified it was his opinion that those data were consistent with the victim having fired a weapon.

An offer of proof was made by the defense that Dr. Guinn would testify the standard used by Mr. Fox, against which to measure his data, was antiquated and obsolete. The trial court refused to permit such testimony, concluding it would amount to expert opinion as to credibility. Appellant now assigns that ruling as error.

My review of the record convinces me that the trial court did not err. Dr. Guinn was permitted to testify at great length concerning his qualifications, his experience, and his own opinions. He testified he had developed standards against which to gauge his test results from his analysis of thousands of test firings. He testified his standard was different from that utilized by Mr. Fox. Finally, Dr. Guinn testified that it was his expert opinion that the residue discovered on the hands of the decedent was consistent with his having recently fired a weapon.

Mr. Fox testified "the standard I use is derived from test firings that I have performed or have had performed at the laboratory, as well as test firings and work that has been done by the F. B. I. and the U. S. Treasury Department." To have permitted Dr. Guinn to testify that in his opinion Mr. Fox' standard was inaccurate would have been tantamount to assailing his credentials as an expert, which the defense has at no time done.

In my view, the issue of credibility as between contesting expert witnesses was fairly before the trier of fact, where it properly belonged. I perceive no error in the court's minimal restriction of Dr. Guinn's testimony.

Appellant's fourth claim of error urges upon us the proposition that the trial court erred in admitting into evidence, over objection, two photographs of the victim's corpse. Of the photographs admitted into evidence at trial, one depicts only the feet and lower legs of the victim, apparently fully clad. Also shown is a shattered bowl of a substance identified as gravy and a crumpled piece of plastic wrap. A second photograph depicts the full-form corpse of the victim lying on his back. While the face of the decedent is not, because of the angle at which the photograph was taken,

discernible, some blood is visible on the floor around the victim's head. I assume it is these photographs about which appellant complains.[1]

Appellant's principle argument is that photographs of a corpse are inflammatory per se. This Court has never adopted that point of view. *Commonwealth v. Schroth*, 479 Pa. 485, 388 A.2d 1034 (1978). Rather, our case law has established a two-step test to determine the admissibility of such photographs. *Commonwealth v. Wade*, 480 Pa. 160, 389 A.2d 560 (1978). First the trial court must determine whether the photographs offered are in fact inflammatory. Such a determination is one within the sound discretion of the court. *Commonwealth v. Batty*, 482 Pa. 173, 393 A.2d 435 (1978). Here the trial court ruled the photographs were not inflammatory. I perceive no abuse of discretion in that ruling.

Once it has been ascertained a proffered photograph is not inflammatory, it is admissible subject to the general rules of relevancy and competency. *Schroth, supra*. In the instant case the photographs at issue were clearly relevant. The defense theory at trial was that the victim was killed accidentally during a struggle. The photographs depicting the position of the body, with the shattered bowl of gravy nearby, were probative of the prosecution theory that no struggle had taken place, but that the victim had been intentionally shot while preparing himself something to eat. Appellant's contrary assertion is without merit.

Next appellant argues the trial court erred in refusing to suppress statements which she made to the police. Particularly, appellant contends her statements should have been suppressed because at the time the statements were made she was emotionally distraught, intoxicated, and disoriented.

It is true there is evidence of alcoholic consumption in the facts surrounding the giving of the statements; indeed, appellant's recorded statement contains several references to

1. Appellant has not found it necessary to point with specificity to the record. See Pa.R.A.P. 2119(c).

drinking. But the statement also contains an admission by appellant that she was not intoxicated.

Both the suppression court and the trial court listened to appellant's taped statement. Both courts concluded that the quality of the voice, the detailed nature of answers to questions, even those asked on collateral matters, required a finding that appellant was not disoriented or distraught. On the record before us, I cannot conclude the refusal to suppress the statement was error.

Appellant additionally argues the ruling of the suppression court was error in that appellant's interrogation was not preceded by proper *Miranda* warnings. Specifically appellant complains the warnings which were administered to her were defective in that she was not informed of her right to free legal counsel.

The record indicates appellant was informed, inter alia: "If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish." Appellant argues that because there was no indication an attorney would be appointed "free" or "without charge" the warnings were legally insufficient.

Appellant relies upon *Commonwealth v. Romberger*, 454 Pa. 279, 312 A.2d 353 (1973), as support for her assertion. Although the opinion in *Romberger* does use the word "free," that case is plainly concerned with the larger issue that an indigent person must be informed an attorney will be appointed to represent him. Moreover the language of *Miranda* itself is that "if he is indigent a lawyer will be appointed to represent him." *Miranda v. Arizona*, 384 U.S. 436, 473, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966). Since that was essentially the language used here, I see no error.

Next appellant asserts the trial court erred in permitting a Commonwealth witness to testify concerning statements made to him by appellant.

On January 4, 1979, appellant sought certain items of discovery from the Commonwealth. Pursuant to Pa.R. Crim.P. 305(B)(1), appellant requested:

"Any written confession or inculpatory statement, or the substance of any oral confession or inculpatory statement, and the identity of the person to whom [it] was made."

By January 10, 1979, the defense had been provided with copies of three statements. On June 14, 1979, four days prior to trial, the defense was provided with a copy of the written statement of Jay Henderson, an ambulance attendant, which recounted admissions made to him by appellant. Appellant contends the trial court erred in not excluding the statement.

As provided for in Pa.R.Crim.P. 305(E), the remedy for noncompliance by a party with a proper discovery request is within the discretion of the court.

"If at any time during the course of the proceedings it is brought to the attention of the Court that a party has failed to comply with this rule, the Court may order such party to permit discovery or inspection, may grant a continuance, or may prohibit such party from introducing evidence not disclosed, other than testimony of the defendant, or it may enter such other order as it deems just under the circumstances." Pa.R.Crim.P. 305(E).

In the instant case the court offered appellant her choice of three options: to proceed to trial as scheduled on June 18, 1979; to continue trial date until the week of July 25, 1979, or to continue trial date until September 10, 1979. Ultimately the latter option was selected and the case proceeded to trial on September 10, 1979. Appellant has failed to illustrate in what fashion this exercise of the discretion of the court prejudiced her. I discern neither prejudice nor error.

Appellant's eighth claim of error is that the trial court erred in refusing her motion for mistrial based upon alleged prosecutorial misconduct. Appellant asserts the prosecutor engaged in prejudicial misconduct during his summation to the jury. Specifically, appellant complains of the following portions of the prosecutor's closing argument.

"Another interesting thing in these photographs, how, did the gun get under David Haberland's hand. The gun got

under David Haberland's hand because Lynn Glass put it there. I submit to you that it is physically impossible for a person, even assuming that he could have shot himself in the head and shoot himself in the side and the gun end up in his hand. The gun was neatly placed there."

"David Haberland had the bowl in his hands and David Haberland, if you look at this photograph, and you see that the saran wrap is still on the floor, was looking down at the bowl taking the saran wrap off the bowl when he got hit in the head with a .38 caliber slug. That is how this happened. Sure, there may have been some argument, but David Haberland didn't have the gun during the argument, Lynn Glass had the gun. . . . David Haberland had that bowl of gravy in his hands, and he wasn't paying any attention to Lynn Glass. She got his attention, all right, shot him in the head and shot him in the side."

"How did that button, and Christine Tomsey indicated the fourth button on the blouse, not the button up here, the fourth button on the blouse, how did that get on the dining room table. Lynn Glass put it there after she shot David Haberland. . . . There was no struggle."

As the trial court correctly observed in its opinion, the physical evidence in this case demonstrated that the victim could not have held the pistol in his right hand and, as appellant contended, inflict upon himself the two wounds. It is a clearly reasonable inference to suggest to the jury that where there were but two people in the room at the time of the killing, and where it was impossible for the victim to have been shot as appellant suggested, that it was likely the accused who had shot the victim and placed the weapon in the victim's hand. The evidence further indicates that the victim had been standing in the kitchen holding a bowl of gravy at the time he was shot. Lastly, the button on the dining room table can logically negate appellant's theory of a struggle which led to an inadvertent fatality.

We have consistently held a prosecutor may make references to the evidence, and draw legitimate inferences there-

from, in his closing. *Commonwealth v. Glass*, 486 Pa. 334, 405 A.2d 1236 (1979). I do not find that in the instant case the prosecutor exceeded these guidelines.

Finally appellant contends the court erred in denying her motion to quash the information. Appellant alleges the motion to quash should have been granted because the information failed to specify the degree of homicide charged, but rather charged appellant with criminal homicide generally. Appellant's contention is not the law in Pennsylvania. A criminal information may charge criminal homicide generally. See, *Commonwealth v. Garcia*, 474 Pa. 449, 378 A.2d 1199 (1977); *Commonwealth v. Polimeni*, 474 Pa. 430, 378 A.2d 1189 (1977).

Additionally appellant claims the information should have been quashed because the Commonwealth failed to establish a prima facie case against her at her preliminary hearing. However, once an information has been approved it is not subject to direct attack. *Commonwealth v. Krall*, 452 Pa. 215, 304 A.2d 488 (1973); *Commonwealth v. Gordon*, 254 Pa.Super. 267, 385 A.2d 1013 (1978).

I would affirm the judgment of sentence.

LARSEN and KAUFFMAN, JJ., join in this opinion.

## OPINION IN SUPPORT OF REVERSAL

ROBERTS, Justice.

Appellant's right to a fair trial was prejudiced in two respects by the trial court's evidentiary rulings, each of which mandates a new trial.

Although the trial court permitted both sides to present expert testimony as to implications of gunshot residue on the victim's hands, the court refused to permit the defense expert to comment upon the validity of the standards used by the prosecution's expert. Of course, since expert testimony is admissible only when it relates to subject matter beyond the knowledge or experience of the average layman, McCormick, Handbook of the Law of Evidence § 13 (Cleary

ed. 1972), it makes no sense to admit only an expert's standards and conclusions and to exclude testimony as to the validity of the standards upon which the conclusions are based. Without the excluded testimony, it was impossible for the jury to make a reasoned evaluation of the competing expert testimony.

Not only did the trial court erroneously exclude testimony; it also erroneously admitted testimony over defense objection which was prejudicial to appellant. The prosecution's theory of the case, that appellant killed the victim because the victim was going to leave her, was supported only by the hearsay testimony of two witnesses. These witnesses, a former employee and the former wife of the victim, each testified that the victim had stated he was dissatisfied with his relationship with the appellant and was going to leave her.

Evidence that the victim was going to leave appellant was never established as relevant to appellant's motive in killing the victim. To establish relevancy it would have been necessary for the prosecution to offer admissible evidence that appellant in fact was aware of the victim's intention. Only then would the victim's state of mind have become relevant to the issue of appellant's state of mind, which alone was material to establish appellant's degree of guilt, if any, on the charge of criminal homicide. See *Commonwealth v. Thornton*, 494 Pa. 260, 431 A.2d 248 (1981).

*Commonwealth v. Lowenberg*, 481 Pa. 244, 392 A.2d 1274 (1978), relied upon by the Opinion in Support of Affirmance, is clearly distinguishable from the present case. In *Lowenberg*, the victim's out-of-court statement that she had intended to see appellant on a matter "far worse than borrowing money," was admissible as within the state of mind exception to the hearsay rule only because on that record the victim's intention had been rendered relevant through independent, admissible evidence to prove the defendant's state of mind.

Because appellant has been deprived of a fair trial, judgment of sentence should be reversed and a new trial granted.

## OPINION IN SUPPORT OF REVERSAL

FLAHERTY, Justice:

I believe it was error to exclude testimony of the defense expert to the effect that standards used by the state in concluding that the victim did not fire the murder weapon were antiquated and obsolete.

Emergency personnel were summoned to the home of David P. Haberland and Lynn Glass, the appellant, during the early morning hours of November 25, 1978. Upon arrival, they found the dead body of Mr. Haberland lying in the kitchen. A .38 caliber handgun was found underneath the body and the police were called.

Ms. Glass, who called for help, gave statements to an ambulance attendant and a police officer at the scene. Later, she volunteered a statement on tape at the police station. She stated that Mr. Haberland arrived home shortly after she did in the early morning hours of November 25, 1978. He entered through the back door carrying a gun. Subsequently there was an argument and a struggle. Ms. Glass was knocked to the floor and remembered crawling to the couch, where she fainted or fell asleep. When she awoke, she saw the body of Mr. Haberland. With some variations, Ms. Glass's statement to a police officer at her home and her statement to an ambulance attendant were the same as the taped statement given at the police station. Her contention at trial was that the handgun discharged during a struggle while in the hand of the victim.

Apart from these statements the Commonwealth's case consisted of testimony that Mr. Haberland intended to abandon his relationship with Ms. Glass, and of various technical reports concerning, *inter alia*, the cause of death, the probable position of the body relative to the handgun, the probable distance between the handgun and the body at the time of firing, and the probability or improbability that the victim could have fired the weapon himself. At issue with regard to this last point is the testimony of Mr. Fox, an expert for the Commonwealth, that his tests indicated an

insufficient quantity of the elements barium and antimony on the hands of the victim to be consistent with the victim having fired the .38 caliber handgun which caused death. The measurements of trace amounts of barium and antimony conducted by Mr. Fox indicated that there were present on the hands of the victim .77 microgram of barium and .16 microgram of antimony. He further testified that the standard used for determining whether a person has fired a weapon of the type used in this case requires a minimum of "two-tenths of a microgram of antimony and five-tenths of a microgram of barium. Both of these elements have to be above that amount in order for it to be considered a positive result...." In other words, according to the standards articulated by Mr. Fox, there was more barium present on the hands of the victim than is required for a finding that the victim fired a gun, but .04 microgram less of antimony than is required.

The defense expert disagreed with the standard articulated by Mr. Fox for determining whether a given amount of barium and antimony deposits were consistent with the victim having fired the handgun. Mr. Fox's measurements of .77 and .16 microgram were not questioned, only his interpretation of the significance of those figures. Dr. Quinn, the defense expert, testified in camera:

Dr. Quinn: I have no basis for doubting any of [Fox's] numbers. They look like reasonable numbers and he is using a good piece of apparatus. I think he knows how to use it. I think if we analyze the sample either by Atomic Absorption or Activation Analysis, the same samples we would get numbers almost exactly like those. I am not contesting his numbers at all. What I think is clearly wrong in his written report that I have a copy, he makes the statement that none of these show any—I forget even his exact wording. I have to look it up; none of these show definitely the presence of gunshot residue, and all he is using is a rule of thumb. Now that has kind of an interesting origin how it came about, which says if you don't find more than the rule he uses two-tenths of a

microgram of antimony and five-tenths of a microgram of barium, you just arbitrarily say there is no gunshot residue. Well that is totally wrong. When you take for example in this .38 caliber gun and you fire it, you test fire repeatedly and you sample the hand every time after a firing. You get a wide spread of numbers and it isn't by the way of analytical methods because the real amount deposited very [sic] widely, and that—all of that is compiled in our study there, and you will find from real geniue [sic] .38 caliber firings that you will get numbers higher than some of these and you will get numbers lower than some of these that he has said show no presence of gunshot residue, and one number in particular is just about an average .38 caliber firing.

Shortly after this testimony, the following exchange occurred, also in camera:

By the Court: Are you going to say in layman terms that the conclusions reached by Fox have to be faulty because his statement that you just read, whatever it is, is faulty in of itself.

Dr. Quinn: His analysis I don't question at all. How he interpreted his numbers I think is erroneous. I think he lacks experience. He doesn't know what typical .38 calibers put out. He obviously hasn't studied these things and this is used as the comparison background.

In sum, the defense expert sought to testify that Mr. Fox's standard requiring .20 milligram of antimony and .50 milligram of barium is obsolete and antiquated. As a part of this testimony, the defense expert would have shown by charts that many test firings of .38 caliber handguns reveal that even the same handgun can give different readings from one firing to another and that the levels of barium and antimony found on the victim's hands, .77 milligram of barium and .16 milligram of antimony, are within the range of barium and antimony deposits which have been charted in test firings of .38 caliber handguns, and therefore that the deposits found on the victim's hands are consistent with the victim having fired the weapon. For these reasons, he

would have concluded that the standards used by Mr. Fox were not conclusive.

In *Gillman v. Media, Etc., E. Ry. Co.*, 224 Pa. 267, 273–274, 73 A. 342 (1909), we stated: "Where the facts are admitted or proved by evidence which is not conflicting, an expert may be asked his opinion upon such facts." The Superior Court in *Schwartz v. Feldman*, 196 Pa.Super. 492, 498, 175 A.2d 153 (1961) stated:

> When an expert expresses an opinion, it is within the discretion of the trial judge to permit another expert to be called to show that the facts do not support that opinion, and that no positive opinion can be properly found from the available facts.

This is consistent with 3A Wigmore, *Evidence* § 992(2) (Chadbourn rev. 1970), which states that the incorrectness or insufficiency of data on which an expert tests his opinion may be established by the calling of other witnesses:

> This is permissible and common, without doubt, so far as it involves merely the questioning of other expert witnesses, upon their opinion of the validity of the first witness' grounds; for they are usually called primarily for the sake of their own opinion in the cause, and their discrediting of the first witness' grounds of opinion may incidentally be inquired into without encumbering the issues.
>
> For example, when a medical witness, testifying to the cause of death as drowning, states as a ground the presence of froth on the lungs, and then other medical witnesses, testifying to the cause of death, deny that froth on the lungs indicates death by drowning.
>
> But where the confuting of the data given requires the calling of witnesses who would not notherwise [sic] be in the cause, the propriety of this is open to doubt. Nevertheless, it may often become highly important for exposing error; and the trial court should have discretion to permit it.

The question in this case, then, is whether the trial judge abused his discretion in not permitting Dr. Quinn's testimony concerning the accuracy of Mr. Fox's standards. I would

hold that the trial judge abused his discretion for the following reasons: (1) the testimony did not require the appearance of witnesses who would not otherwise be in the case; (2) the testimony was highly important for exposing error; (3) the Commonwealth's case may have been significantly weakened in the eyes of the jury if there had been direct testimony from the defense expert that the standards used by Mr. Fox were antiquated and obsolete.

In cases involving expert testimony which articulates conclusions based on standards of measurement, if there is a question about the accuracy of the standards, other experts must not be foreclosed from giving expert testimony to the effect that the standards *may be wrong.* To exclude such testimony works an obvious unfair disadvantage to the defendant.

I would vacate the judgment of sentence and grant a new trial.

NIX, J., joins.