472 A.2d 211

**COMMONWEALTH of Pennsylvania**

v.

**Lamont HENDERSON, Appellant.**

Superior Court of Pennsylvania.

Submitted Sept. 9, 1983.

Filed Jan. 27, 1984.

Petition for Allowance of Appeal Denied Oct. 15, 1984.

Robert Scandone, Philadelphia, for appellant.

Robert B. Lawler, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before SPAETH, President Judge, and CAVANAUGH and HOFFMAN, JJ.

CAVANAUGH, Judge:

In this case the appellant, Lamont Henderson, was tried before Stout, J. and a jury. After a lengthy trial he was found guilty of first degree murder, robbery and possessing an instrument of crime. The appellant's post-trial motions were denied and he was sentenced to life imprisonment for murder and concurrently to ten to twenty years for robbery and two and one-half to five years for the weapons offense. An appeal has been taken to this Court from the judgment of sentence.

We must view the evidence in the light most favorable to the Commonwealth as verdict winner, and accept as true all evidence and reasonable inferences therefrom, upon which, if believed, the factfinder could properly have based its verdict. *Commonwealth v. Helm*, 485 Pa. 315, 402 A.2d

500 (1979). Applying this test, the evidence established that a Philadelphia Police Officer, Jack Holcomb, Jr., advertised his 1979 Pontiac Trans-Am for sale in a local newspaper. The appellant, in response to the ad, called Officer Holcomb's house to inquire about the car. He spoke to Mrs. Holcomb as Officer Holcomb was not at home. On June 1, 1981, the appellant approached two acquaintances, Cecil Wright and James Parker, who went by the nickname of Bam, and asked if they knew where he could obtain a .38 or .32 calibre gun. They told him they didn't know and he asked them if they thought a .25 calibre automatic would kill someone. Bam told him that he thought so "if you shoot him in the head." Appellant asked Bam and his friend if they would kill the individual who was going to come to his house in connection with the sale of his car and they refused.[1] Appellant then described how he would shoot the individual from behind after he brought him into the dining room.[2]

1. In connection with the appellant's request that Wright and Parker (Bam) kill the decedent, Wright testified as follows:
   A. He asked both of us. I told him I was on probation, I wasn't going to do it, and Bam told him he didn't have the heart to pull the trigger.

2. Mr. Parker testified concerning the manner in which the appellant was going to carry out the homicide as follows:
   BY MR. KING:
   Q. What, if any, question was asked of you by Mr. Henderson? Withdraw the first question.
   A. He said would we like to kill him for him.
   Q. Who was he talking to?
   A. He was talking to me and Cecil Wright.
   Q. What did you say?
   A. I said no because I wouldn't have the heart to pull the trigger.
   Q. What did he next say?
   A. He said, "Well, this is how I plan to do it."
   Q. How did he tell you he had planned to do it?
   A. He was going to bring the officer over his house.
   MR. SCANDONE: Objection. Excuse me. I apologize.
   THE COURT: Go ahead.
   THE WITNESS: He was going to bring the officer over his house, sit him in the dining room chair with his back toward the door. He was going to have the gun sitting in the chair near the front door under the cushion and he was going to walk to the front door, get the gun from under the chair, walk behind him and shoot him.

On June 2, 1981 the decedent told his wife that Lamont Henderson had offered him $4,000.00 to hold the car for him so that no one else would buy it. On the early morning of June 3, 1981 he told her that he was supposed to meet with the appellant that day and that they were going to go to the credit union concerning the car that the decedent was selling and afterwards he was going to Campus Datsun to pick up a car that he was going to buy.[3] A friend of the decedent, Arthur N. Sanborn, III, also testified that on June 3, 1981, the decedent told him that he was "to see a gentleman that was going to buy the car from him."[4] In

BY MR. KING:
Q. What did you say when he told you that?
A. I said, well, that's his business.

**3.** Mrs. Holcomb's testimony concerning this was as follows:
Q. What, if anything, did he say he was going to do on June the 3rd of 1981?
MR. SCANDONE: Objection, Judge.
THE COURT: Overruled.
THE WITNESS: Well, that morning I was supposed to call him at 8:30 in the morning and wake him up and he was supposed to go out to Neil's Sportmotive in Bryn Mawr to have his steering wheel taken out of the car. He had a special steering wheel and his radio. He had a special radio. Have that taken out of the car and have the original steering wheel replaced and the original radio replaced in the car. Then he was supposed to—after that—after he did that he was supposed to meet with Lamont Henderson and they were supposed to go to the credit union and transact their business with the car, then he was supposed to go to Campus Datsun to pick up his other car, the car that he was going to buy.

**4.** The testimony of Mr. Sanborn in this respect was as follows:
Q. Did he indicate to you what his intentions were upon leaving?
A. Yes, sir.
Q. What did he say?
A. He was going to take his car and go down to a place in South Philadelphia to see a gentleman that was going to buy the car from him, and then he was going to go to the Credit Union to transfer the title of that car to the new owner, then he was going to go pick up another car and go to work.
Prior to Mr. Sanborn's testimony counsel for the appellant made the following objection which was overruled by the court:
MR. SCANDONE: Judge, just to make it easier, I don't want to keep on having to object every time someone testifies on what Jack E. Holcomb, Jr., had said that day.
My objection is—I understand that because he's deceased it can go to the state of mind. But I object, Your Honor, to the District

addition, the decedent's father testified that he spoke to his son on the night of June 2, 1981, and the deceased told him of his plan to sell his car to the appellant on the next day.

On the afternoon of June 3, 1983 at about 2:30 p.m. Officer Snyder, a member of the Philadelphia Police Department, saw the deceased and the appellant together on the 1600 block of South 56th Street. The appellant told Officer Snyder that he was going to buy the decedent's car. The decedent was also observed on the same day by a neighbor of appellant getting out of his car near appellant's home. She subsequently saw the decedent sitting in the appellant's dining room. The appellant lived at 1813 South Cecil Street, Philadelphia, Pennsylvania, with Ms. Cheryl White and her two children. Ms. White returned home at about 3:00 p.m. on that date. Ordinarily she would have arrived home at about noon but the appellant told her not to hurry home on that day. When she arrived at the house she observed the decedent sitting on a chair in the dining room. There was a brown puddle on the floor in back of the chair. He looked like he was asleep when she first saw him, and she told the appellant to "get the shit out of my house." He did nothing with respect to the decedent at that time but instead took Ms. White for a drive in the decedent's automobile. After a short time she objected as she "didn't like riding in a dead man's car." Appellant and Ms. White remained outside the house for over an hour. When they returned to the house the body was still there. Ms. White went to the bedroom upstairs and she heard "a scuffle and something going bump" from the direction of the dining room. A short time

Attorney using it as conduct or for his conduct of the day. I think that is what he has been trying to do with the wife and what he may try to do with this man.

I understand, as I'm saying, that if it's used only for the state of mind, Judge, then—

THE COURT: That is what it is.

MR. SCANDONE: The reason I'm objecting, Judge, is—I can tell the Court I have a continuing objection.

THE COURT: And you have a continuing overruled.

MR. SCANDONE: I don't want to just keep doing it in front of the jury.

[Side-bar conference concluded.]

later the appellant came upstairs and asked for a towel or rag which she gave him.

At about 2:30 a.m. on June 4, 1981, the appellant went to the residence of James Parker (Bam) and asked him to help him remove a carpet from his basement as he wanted to place it in an abandoned house. The two then drove back to the appellant's residence in the decedent's automobile and the appellant gave Mr. Parker a ring and watch which had belonged to the decedent. After arriving at the house the two men went to the basement where the rug was located. At this time Parker observed a leg sticking out of the carpet.

At approximately 4:00 a.m. on June 4th two police officers who were investigating a missing persons report pertaining to Officer Holcomb arrived at the residence where appellant lived. They observed the decedent's automobile parked nearby. They immediately proceeded to the house where the appellant lived and were admitted by Ms. White who told them that Lamont Henderson was not at home. The police noticed a strong odor of disinfectant in the dining room. As they proceeded to the rear of the house the appellant came running up the cellar steps. He was arrested immediately and at this time the police observed blood on the cellar stairs. Appellant stated that "Bam did it and I was just helping him move him." The police went down into the basement where they located Officer Holcomb's body and also found Mr. Parker who was still in the basement. Officer Holcomb had been shot through the back of the head.

The police searched the house and located a spent casing of a .25 calibre bullet in the dining room. The deceased officer's service revolver, police identification badge and initialed attache case was located on the second floor of the house.

■ The appellant's first contention is that the court below erred in admitting evidence of statements by the decedent of his intention to sell his automobile to the

appellant. Appellant contends that the evidence was admitted not merely to show the decedent's intention concerning his future activities but to establish specific conduct of the decedent. The appellant objected to the testimony of decedent's wife, his father and his friend, Mr. Sanborn, which dealt with what the decedent intended to do on June 3, 1981. There is no doubt that the testimony was hearsay but there is a "recognized exception to the rule barring admission of hearsay testimony for those out-of-court declarations which are offered to prove the declarant's state of mind." *Commonwealth v. Williams*, 270 Pa.Super. 27, 41, 410 A.2d 880, 887 (1979). *See also, Binder, The Hearsay Handbook* (Second Edition), Exception 3; Federal Rule of Evidence 803(3); *Commonwealth v. Wright*, 455 Pa. 480, 317 A.2d 271 (1974). In the *Williams* case, the appellant objected to testimony by the decedent's mother that on the day prior to the decedent's death she told her that she had made an appointment with an attorney to commence divorce proceedings against the appellant. The court held that this statement of intent was "classically a state of mind declaration admissible under the exception." 270 Pa.Super. at 42, 410 A.2d at 887.

In *Commonwealth v. Marshall*, 287 Pa. 512, 135 A. 301 (1926) the court, affirming a conviction of murder, approved admission of testimony that the victim, on the morning of the day that she was killed, told a fellow passenger on a train that she was going to meet defendant that evening. The court stated at 287 Pa. 522, 135 A. 304:

Intention, viewed as a state of mind, is a fact, and the commonest way for such a fact to evince itself is through spoken or written declarations. It is, therefore, because of the impossibility, in many cases, of proving intention apart from personal declarations, that they are admitted. The true basis of their admission, then, is necessity, because of which an exception to the hearsay rule is recognized, ...

Accord: *Commonwealth v. Wilson*, 394 Pa. 588, 148 A.2d 234 (1959); *Commonwealth v. Lowenberg*, 481 Pa. 244, 392 A.2d 1274 (1978).

In *Commonwealth v. Riggins,* 478 Pa. 222, 386 A.2d 520 (1978), which was also a murder case, the appellant objected to testimony by the decedent's sister that the decedent told her in a telephone conversation that the appellant was expected to visit her that evening. The Supreme Court pointed out at 478 Pa. 233, 234, 386 A.2d 526:

Appellant contends that this testimony was hearsay and improperly admitted. It is argued that the only purpose for the admission of the evidence was to establish the truth of the remark that appellant would be at the home of the deceased later that evening. If, in fact, this was the purpose of the challenged evidence, then appellant would be correct in his assertion that this evidence would represent a classic example of hearsay evidence. However, we are satisfied that this evidence was admissible to show the state of mind of the victim, evidencing her intent to remain at the house and her willingness to admit him. This testimony was particularly crucial in view of the evidence that the house was kept secured and that persons would not be admitted unless known to the occupants.

In *Commonwealth v. Lowenberg,* 481 Pa. 244, 392 A.2d 1274 (1978), also a murder case, the appellant objected to the introduction of a statement by the decedent that she wanted to see the appellant in connection with a serious financial matter. The Supreme Court held that the statements were within the "state of mind exception" to the hearsay rule and properly admissible. The court stated that: "... the admission of this type of evidence is justified because the circumstances in which these utterances were made indicate that they accurately reflected the declarant's state of mind at that time and there was an absence of a motive to deceive." 481 Pa. at 255, 392 A.2d at 1279.

In the instant case, the appellant's counsel argued at trial, as he does on appeal, that the evidence was used to establish the decedent's actual conduct on the day of the homicide, namely that he had in fact gone to the appellant's residence in Southwest Philadelphia. This contention is

without merit. The objected to testimony merely established that it was the decedent's intent to meet with the appellant on June 3, 1981 in connection with the sale of the decedent's automobile to the appellant.[5] The testimony does not establish that he went to the appellant's residence but that he merely intended to do so. Independent testimony established that the decedent was at the appellant's house on June 3, 1981. We are convinced that the testimony falls clearly within the "state of mind" exception to the hearsay rule.

5. The fact that the decedent intended to meet with the appellant was relevant and it made it more likely that he subsequently met with defendant than if he had no such intention. The fact that Holcomb met with defendant on the day of the murder makes it more likely that defendant murdered him than if he had not met with defendant that day. At least the jury could so infer.

In the leading case of *Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706, (1892) the beneficiary sued for the proceeds of a policy of insurance on the life of John Hillmon. The insurance company defended by alleging that the body found in a miner's camp was that of a man named Walters, not Hillmon. The insurance company unsuccessfully sought to introduce evidence of letters written by Walters to his sister and fiance approximately two weeks before the body was found, in which Walters declared his immediate intention to accompany Hillmon on a westward journey. The Supreme Court held it reversible error to exclude this evidence. After holding that an assertion of then existing intent is an exception to the hearsay rule, the Supreme Court explained its relevance, 145 U.S. at 295–296, 12 S.Ct. at 912–913:

The letters in question were competent, not as narratives of facts communicated to the writer by others, nor yet as proof that he actually went away from Wichita, but as evidence that, shortly before the time when other evidence tended to show that he went away, he had the intention of going, and of going with Hillmon, which made it more probable both that he did go and that he went with Hillmon, than if there had been no proof of such intention. In view of the mass of conflicting testimony introduced upon the question whether it was the body of Walters that was found in Hillmon's camp, this evidence might properly influence the jury in determining that question.

Accord: *Ickes v. Ickes*, 237 Pa. 582, 85 A. 885 (1912); *Hughes v. Bailey*, 202 Pa.Super. 263, 195 A.2d 281 (1963).

Testimony concerning assertions made by Officer Holcomb that he intended to visit defendant on the day of his murder was hearsay, but was admissible under an exception to the hearsay rule. Such testimony had probative value as circumstantial evidence that Officer Holcomb carried out his intention and met with defendant at or about the time that he was killed.

■ Appellant's second contention is that the court erred in not permitting evidence of the circumstance surrounding the administering of a lie detector test to the appellant. The appellant concedes that the results of polygraph examinations are not admissible in evidence for any purpose. *See Commonwealth v. Gee*, 467 Pa. 123, 354 A.2d 875 (1976). The results are not even admissible when both the defendant and prosecutor stipulate that they may be admitted in evidence. *Commonwealth v. Pfender*, 280 Pa. Super. 417, 421 A.2d 791 (1980). Nevertheless, the appellant argues that the Commonwealth used the setting of the polygraph examination and interview as subterfuge to obtain statements.[6] The appellant does not refer to any

6. Appellant offers the following cross-examination at the suppression hearing to justify presentation to the jury the circumstances surrounding the polygraph examination:

"By Mr. Scandone:

Q. Officer, when the man was brought down to you, he signed or he was asked to sign a polygraph examination consent form which has been marked Commonwealth's Exhibit—is it?

Mr. King: C–6C.

By Mr. Scandone:

Q. C–6C. Do you have that in front of you, sir?

A. Yes, sir.

Q. That basically tells the defendant that anything he says will be used against him; is that correct?

A. Yes, sir.

Q. You are personally aware, are you not, that polygraph examination results are not admissible at trial; is that correct?

A. Yes, sir.

Q. Did you tell that to the defendant?

A. No, sir.

Mr. King: Objection, Your Honor.

The Court: Sustained.

Mr. Scandone: If Your Honor please, I think it's relevant why the statements or whatever statements were made by the defendant—

The Court: Still sustained.

Mr. Scandone: Still asked.

By Mr. Scandone:

Q. Now, when you were asked to do an examination, sir, what did you consider your responsibilities to be?

"Mr. King: Objection.

The Court: Sustained.

"By Mr. Scandone:

Q. Well, sir, when you were asked to give an examination, was your responsibility to give an examination, or was your responsibility to try to get a statement from the defendant?

statements which might have resulted from coercion induced by the lie detector test. There was no evidence of chicanery or subterfuge pertaining to the polygraph examination and the court properly excluded the evidence.

Judgment of sentence affirmed.

Q. Isn't one different than the other, sir?

    Mr. King: Objection.

    The Court: Overruled.

    The Witness: No, sir.

Shortly thereafter, the following exchange occurred between counsel for appellant and the lower court:

"The Court: You aren't questioning the fact that our machine is the standard machine, are you?

Mr. Scandone: No.

The Court: All right. Sustained.

Mr. Scandone: I am questioning, however, what his function was as a polygraph examiner.

The Court: We know what his function was. It was to give a polygraph test. What is next?

Mr. Scandone: That is a matter of—we will do that in front of the jury, Judge.

The Court: No, you are not going to argue about the polygraph in front of the jury.

Mr. Scandone: We are going to argue about what his function was.

The Court: No, you are not going to do that either. Go ahead. What is next?"